## UNITED STATES v. ANDERSON.

### (District Court, E. D. Wisconsin. May 5, 1915.)

INDIANS ⊜⟶15—ALLOTMENTS—RESTRAINT ON ALIENATION—REMOVAL BY STATUTE.

Act June 21, 1906, c. 3504, 34 Stat. 382, providing that the members of the Stockbridge and Munsee Tribe of Indians, who have not heretofore received patents for lands in their own right, shall, under the direction of the Secretary of the Interior, be given allotments of land and patents therefor in fee simple, and declaring it obligatory on a member who has made a selection of land in the reservation to accept it as an allotment, at once, makes one who has already made his selection, pursuant to the provisions of the Stockbridge and Munsee Treaty of February 5, 1856 (11 Stat. 663), for allotment, owner of such land in fee simple, discharged of any power of restraint on alienation in the President or the Secretary of the Interior, and makes the issuance of a patent only a ministerial duty, so that such allottee's deed of his land, before issuance of patent, conveys the fee to the grantee, to whose benefit the subsequently issued patent inures.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 29, 34, 37–44; Dec. Dig. ⊜⟶15.]

In Equity. Suit by the United States against August Anderson. Decree for defendant.

Guy D. Goff, U. S. Atty., and Otto H. Breidenbach, Asst. U. S. Atty., both of Milwaukee, Wis.

A. S. Larson, of Shawano, Wis., for defendant.

GEIGER, District Judge. The government has instituted this suit to annul a conveyance made by Mary Butler Tousey, formerly a member of the Stockbridge and Munsee Tribe of Indians, to the defendant, Anderson, of lands described in the complaint. The facts are simple and practically without dispute, though they involve consideration of the legislative and executive relations of the government with the named tribe. Preliminarily, and as an introduction to references to such relations, it suffices to say that Mary Butler Tousey's mother was a white woman. Her father was the issue of a marriage of a white man to a female quarter blood. Mary, her father, and her mother were born off the reservation, were and are citizens, and have spent little of their time with the Indians. The Stockbridge and Munsee reservation, created by treaty and congressional acts, has been dissolved through the patenting in fee simple of the lands comprising the same to the members of the tribe, pursuant to Act Cong. June 21, 1906, hereafter referred to. Such patents convey to the respective members of the tribe absolute fee-simple titles without any restrictions upon alienation. Mary Butler Tousey's deed to the defendant, Anderson, was executed and delivered July 24, 1909, for a consideration of $650, conceded to be full value. The government patent to her—which is like others above referred to—was not actually executed until April 4, 1910. This suit was begun July 31, 1913.

The case therefore necessitates an inquiry into the status of Mary Butler Tousey, with respect to the lands in question, at the time of her conveyance to Anderson; and this inquiry may well start with an

examination of the treaty concluded in 1856 between the United States and this tribe of Indians. 11 Stat. 663. Prior to and since that time, the history of the tribe seems to have been one of dissension, inter-tribal, as well as with the government, and in many respects the relations subsisting between the tribe and the government have the impress of confusion and contradiction; but upon the question here presented it is believed—particularly in view of adjudications by this court to which reference will be made—the status of the Indians under the treaty and successive congressional acts, in and to their lands, can be made consistent throughout. The preamble of the treaty recites prior conventions between the Indians and government, congressional acts, the tribal dissensions and disputes, the desire of the government to pursue a liberal policy, to the end that citizenship may be conferred upon the Indians, etc., whereupon stipulations are entered for valuable retrocessions and releases by the Indians to the United States, in consideration whereof the latter reserves—

"a tract of land near the south boundary of the Menominee reservation of sufficient extent for each head of family and others lots of land of eighty and forty acres as hereinafter provided."

The treaty continues:

"Article III. As soon as practicable after the selection of the lands set aside for these Indians by the preceding article, the United States shall cause the same to be surveyed into sections, half and quarter sections, to correspond with the public surveys, and the Council of the Stockbridges and Munsees shall under the direction of the Superintendent of Indian Affairs for the northern superintendency, make a fair and just allotment among the individuals and families of their tribes. Each head of a family shall be entitled to eighty acres of land, and in case his or her family consists of more than four members, if thought expedient by the said council, eighty acres more may be allotted to him or her; each single male person above eighteen years of age shall be entitled to eighty acres; and each female person above eighteen years of age, not belonging to any family, and each orphan child, to forty acres; and sufficient land shall be reserved for the rising generation.

"After the said allotment is made, the persons entitled to land may take immediate possession thereof, and the United States will thenceforth and until the issuing of the patents, as hereinafter provided, hold the same in trust for such persons, and certificates shall be issued, in a suitable form, guaranteeing and securing to the holders their possession and an ultimate title to the land; but such certificates shall not be assignable, and shall contain a clause expressly prohibiting the sale or transfer by the holder of the land described therein. After the expiration of ten years upon the application of the holder of such certificate, made with the consent of the said Stockbridge and Munsee Council, and when it shall appear prudent and for his or her welfare, the President of the United States may direct, that such restriction on the power of sale, shall be withdrawn and a patent issued in the usual form."

"Article XI. The object of this instrument being to advance the welfare and improvement of said Indians, it is agreed, if it prove insufficient, from causes which cannot now be foreseen, to effect these ends, that the President of the United States may, by and with the advice and consent of the Senate, adopt such policy in the management of their affairs, as in his judgment may be most beneficial to them; or Congress may, hereafter, make such provision by law, as experience shall prove to be necessary."

In United States v. Torrey Cedar Co. and United States v. Paine Lumber Co. (C. C.) 154 Fed. 263, the late Judge Seaman had before him the question whether under this treaty, and the congressional act

next to be referred to, the Indian allottees were vested with a sufficient title in their allotments to authorize the cutting of timber for sale and not by way of improvement, without the consent of the Department of the Interior. In answering the question affirmatively—his view subsequently receiving the approval of the Supreme Court (206 U. S. 469, 27 Sup. Ct. 697, 51 L. Ed. 1139)—he gave the treaty this effect:

"Under the terms of this treaty, the policy of earlier treaties, to reserve to the Indians 'to be held as other Indian lands are held'—a mere right of occupancy—was changed to intend an ultimate title in fee simple. Pending the patent, while the legal title is in the United States, the allottee was vested with the equitable title contemplated by the treaty (Crews v. Burcham, 1 Black, 352, 356, 17 L. Ed. 91), unless modified by act of Congress, or by concurrent action of the President and Senate, if therein subject to modification. The provision in restraint of alienation meantime 'is not inconsistent with a fee simple estate.' Libby v. Clark, 118 U. S. 250, 255, 6 Sup. Ct. 1045, 30 L. Ed. 133. Assuming, as suggested in the argument (but not so ruling), that the provision for title to go to the tribe in default of heirs would turn it into a base or qualified fee, the allottee living 'has the same rights and privileges over his estate as if it were a fee simple' (11 Am. & Eng. Ency. of Law [2d Ed.] 369, and citations), and is not liable for waste (Id. 374). See U. S. v. Reese, 5 Dill. 405, Fed. Cas. No. 16,137."

On January 25, 1871, there was passed a further act "for the relief of the Stockbridge and Munsee Tribe of Indians." Act Feb. 6, 1871, c. 38, 16 Stat. 404. It dealt with a situation of dissension presenting two factions, the "citizen" and the "Indian" parties, and made provision for the sale of the lands of the reservation, the distribution of proceeds to, and the surrender by, the members of the citizen party of all their claims, and for the recognition of the Indian party thereafter as the "Stockbridge Tribe of Indians," and their assignment to a "permanent reservation." Of the portion of the act relating to the latter, Judge Seaman, in the cases supra, expressed this view:

"This act expressly recognized the rights of allottees under the treaty, declared the 'lands assigned and allotted to be held inalienable,' and on 'reversion to become the common property of the tribe,' and that the title be held by the United States, until patent issues, 'in trust for the individuals and their heirs to whom the same were allotted.' A prior act of 1865 (13 Stat. 562) authorized homestead entries and application for citizenship by members of this tribe, but does not touch the present inquiry, and no other congressional action appears in reference to the reservation or allotments therein."

It may be noted that an act of March 3, 1893, was passed (27 Stat. 744) to meet the departmental construction whereby certain Indians who were beneficiaries under the treaty of 1856 were excluded from the act of 1871 last above referred to, and by such act of 1893, the treaty benefits were expressly restored to them. The act is significant, however, in its declaration that all members of the tribe—

"who entered into possession of lands under the allotments of 1856 (the treaty), and the act of 1871 (above referred to), and who, by themselves or their lawful heirs, have resided on said lands continuously since, are *hereby declared to be* owners of such lands *in fee simple, in severalty,* and the government *shall issue* patents *to them therefor.*"

I say this is significant, in view of the claim of the defendant, that the whole history of the legislative and executive action discloses suc-

cessive relaxation as well as surrender from time to time of the restraints originally imposed by the treaty, and, as is now claimed, culminating in the act of 1906 in a final discharge of any discretionary reservation thereof by the government, leaving, so it is urged, the performance of the ministerial act of delivering evidences of title, except as to those members of the tribe whose rights in and to particular selections or descriptions had not become fixed and ascertained, and with respect to whom further tribal or departmental action by way of making actual allotment was necessary.

Certain further observations are here necessary before considering the legislative steps next taken, and which present the crucial point in the case. It will be recalled that the treaty of 1856 vested in the "Council of the Stockbridge and Munsees, under the direction of the Superintendent of Indian Affairs," the power to make a "fair and just allotment among the individuals and families of their tribes." Further provision was made for the issuance of certificates to the respective allottees "in suitable form guaranteeing and securing to the holders their possession and an ultimate title to the land." It appears without controversy that, obediently to this provision and pursuant to the congressional acts referred to, the tribal council—or, as it has been called in this case, the business committee of the tribe—has exercised the granted authority, and allotments or selections have been made and adopted by the government from time to time as complying with this provision. Although certificates of allotment containing the treaty guaranty have not been issued, this failure or default on the part of the government in no degree detracted from or impaired the title otherwise flowing from the act of allotment or selection conformably to the treaty. United States v. Torrey Cedar Co., supra.

In fact, the Indian agent in charge of this reservation and its agency when the allotment to Mary Butler Tousey was made—and it is undisputed that the tract in question here was selected by and allotted to her in 1899—testified in this case that at the time and for some years thereafter no other method of making allotments was known, and that he protected the Indians in the selection and allotments thus made through the council or business committee and entered on the tribal record and communicated to the agency or department in connection with the general affairs to the tribe and its or their property relations with the government. The Indians, in making selections in this manner, thereby became "entitled to recognition as allottees, *with all the rights intended by the treaty, pending the issue of a patent.*" United States v. Torrey Cedar Co., supra. So it may be taken as established that Mary Butler Tousey, as early as 1899, acquired a status as an allottee, with the rights last noted.

One further fact, properly to be alluded to, is: Prior to 1900, the members of the Stockbridge Tribe petitioned the United States government, acting through its Indian office, for a final dissolution of the tribe and a distribution of the tribal property, the latter to include the patenting of the lands in fee simple. Thereupon a representative of the government was sent to the tribe and entered into an agreement, signed by a majority of the adult male members, entitled "Proposed Plan of Settlement with the Stockbridge and Munsee Tribe of In-

dians." Such agreement is now referred to, principally because defendant claims it to have been the basis of the act of June 21, 1906, and such claim seems conclusively supported by the fact that the following portion of the proposed agreement is incorporated almost literally in said act, viz.:

"Provided, however, that in all cases where members of said tribe have made selections whether filed with the business committee of said tribe, or otherwise, it shall be obligatory upon such member or members to accept said selections, not to exceed the acreage pro rated as above, and that in all other cases it shall be optional with such members to accept such allotment, or in lieu thereof the sum of two dollars per acre, which sum is hereby agreed to be the equivalent of said land."

We are now brought to the act of June 21, 1906 (34 Stat. pt. 1, p. 382, c. 3504), entitled:

"An act making appropriations for the current and contingent expenses of the Indian Department, for fulfilling treaty stipulations with various Indian tribes, and for other purposes, for the fiscal year ending June 30, 1907."

"That the members of the Stockbridge and Munsee Tribe of Indians, as the same appear upon the official roll of said tribe, made in conformity with the provisions of the act [March 3, 1893, supra], * * * and their descendants, who are living and in being on the first day of July, 1904, and *who have not heretofore* received patents for land in *their own right*, shall, under the direction of the Secretary of the Interior, *be given allotments of land and patents therefor in fee simple*, * * * as follows. * * *

"That as there is not sufficient land within the limits of the Stockbridge and Munsee reservation to make the allotments in the quantities above specified, all available land in said reservation shall first be allotted to the heads of families and single persons residing thereon, until said reservation land shall be exhausted, the additional land that may be required to complete the allotments to be obtained in the manner hereinafter specified: Provided, that the Secretary of the Interior may make such rules and regulations as he may deem necessary to carry out the requirements of this Act as to making and designating allotments.

"*That it shall be obligatory upon any member of said tribe who has made a selection of land within the reservation, whether filed with the tribal authorities or otherwise, to accept such selection as an allotment, except that the same shall be allotted in quantity not to exceed that hereinbefore authorized: Provided, that where such selection does not equal in quantity the allotment hereinbefore authorized, the allottee may elect to take out of the lands obtained under the provisions of this act the additional land needed to complete his or her quota of land, or in lieu thereof shall be entitled to receive the commuted value of said additional land in cash, at the rate of two dollars per acre, out of the moneys hereinafter appropriated.*[1]

"That those members of said tribe who have not made selections within the reservation shall be entitled to the option of either taking an allotment under the provisions of this act, or of having the same commuted in cash, at the rate of two dollars per acre, out of the moneys hereinafter appropriated: Provided, that the election of any member to take cash in lieu of land shall be made within sixty days after the date of the approval of this act.

"That for the purpose of obtaining the additional land necessary to complete the allotments herein provided for the Secretary of the Interior is hereby authorized and directed to negotiate, through an Indian inspector, with the Menominee Tribe of Indians of Wisconsin for the cession and relinquishment to the United States of a portion of the surplus land of the Menominee reservation in said state, or to negotiate with the authorities of said state, or with any corporation, firm, or individual, for the purchase of said additional land: Provided, however, that in no event shall any agree-

[1] NOTE.—Compare this italicized clause with excerpt from "Proposed Plan of Settlement," etc., supra.

ment of cession or contract of purchase so negotiated stipulate that a sum greater than two dollars per acre shall be paid for the land so obtained: And provided further, that no such agreement or contract shall have any force or validity unless the same shall be approved by the Secretary of the Interior; or said Secretary may, in his discretion, utilize such unappropriated public lands of the United States as may be required to complete the allotments.

"That certain members of the Stockbridge and Munsee Tribe having made selections of land on tracts patented to. the state of Wisconsin under the swamp-land acts, and having made valuable improvements thereon, the Secretary of the Interior is hereby authorized to cause said improvements to be appraised by an inspector or special agent or Indian agent of his department and to pay to the owners, as their interests may appear, the appraised value of said improvements, in all not to exceed the sum of one thousand dollars, out of the moneys hereinafter appropriated.

"That the sum necessary to carry out the provisions hereof the Secretary ·of the Treasury is directed to· pay out of the Stockbridge consolidated fund in the Treasury of the United States, which fund on the thirty-first of October, nineteen hundred and four, amounted to seventy-five thousand nine hundred and eighty-eight dollars and sixty cents, under the direction and upon the warrant of the Secretary of the Interior."

When this act is read in the light of the treaty, the successive congressional and executive steps affecting the government's relation to this tribe, its opening declaration, that the enrolled members who have *not heretofore* received patents *"in their own right, shall be* given allotments of land, and *patents* therefor *in fee simple,"* evinces conclusively, so it seems to me, the legislative purpose to surrender, finally, any reserved discretionary power of the government over lands to be given to these Indians. It must be borne in mind that we are not now concerned with the question whether the government intended by this act to sever all its relations with the Indians, or whether the act in and of itself is sufficient to free the members of the tribe from their status as Indians who might otherwise be affected by acts pertaining to their social welfare, e. g. the liquor statutes and the like; but the only question is that respecting the freedom of the several Indians who had allotments of land to dispose of their title under the treaty and the various legislative acts as a *fee-simple, unrestricted title.* This act, while obviously in the interest of those generally designated as not having theretofore received "patents in their own right," clearly recognizes such individuals as of the two subclasses: (1)· Those who had theretofore received *allotments* but not patents ; (2) those who had theretofore received neither allotments nor patents. Mary Butler Tousey, as one who had selected the tract in question at the time of the passage of this act, also became bound by its obligations "upon any member of said tribe who has made a selection of land within the reservation, whether filed with the tribal authorities or otherwise *to accept such selection as an allotment,"* etc. Now, by .article 3 of the treaty of 1856, supra, the discretionary power of withdrawing the restriction upon alienation was vested in the President; but by article 11, supra, there was committed to him, apparently, the larger discretionary power of adopting any policy respecting the management of the tribal affairs as in his judgment may be most beneficial to advance the "welfare and improvement of said Indians," or, the article continues, "Congress may, hereafter, make such provision by law, as experience shall prove to be necessary.".

The history of the relations of the government to these Indians subsequent to the treaty, as shown in the successive laws for their "relief," certainly indicates the assumption by Congress of the power granted by the treaty to be exercised in the alternative, either by the Executive or by the Congress. Can it be that these successive acts, culminating in the act of 1906, did not and do not evidence the exercise of such power to the exclusion of executive exercise of the same power upon the same subject? Can it be that, while Congress expressly raised the restriction on alienation by obligating those who had made *selections to accept* them as *allotments,* and mandatorily directed the issuance of patents by the Executive department, the President still retained his full discretionary power under the treaty? It is said, by way of answering these questions, that the language of the act—"*shall be given* allotments of land, and patents therefor"—indicates futurity in the taking effect of the act, and that in the interim the old stipulations respecting alienability can consistently remain in force until actually surrendered by a delivery of the paper evidence of an absolute title. This might be more persuasive than it is, if the history of the policy latterly pursued by the government, not only toward the Stockbridges, but quite generally toward all tribes, did not indicate that *Congress,* and not the Executive, presumes to speak in the first instance upon the matter of lifting these restraints.

Many instances can be cited, either under special or general acts relating to the Indians, where it appears that a discretion resides in the President or the Secretary of the Interior to determine when or under what conditions such restraints may be lifted. But it will be found that such discretion was there lodged either by congressional enactment or by treaty. The Stockbridge and Munsee Treaty of 1856 so lodged it in the President. But, as we have already observed, Congress, either by virtue of the alternative grant of that treaty or by virtue of its inherent power to pass upon it as a question affecting the social and political status of Indians, has assumed throughout the past 50 years, from time to time, to pass upon this very matter, and has declared in the acts referred to—and which declarations have been treated as mandatory—that certain specified members of the tribe be given fee simple patents. However, the language of futurity referred to must be considered in connection with the clause imposing upon those members who had made selections, the obligation to *accept them* as allotments. This, in my judgment, absolutely removed those members from the necessity of any further or other consideration, except that of *verifying* their selection to be in conformity with their right and issuing a patent therefor.

It is suggested by the government that this provision was binding upon such members *at the option of the government.* It seems to me that this construction would not only be repugnant to the situation with which Congress was endeavoring to deal, but would be singularly violative, by the government, of its treaty obligations. These allotments or selections having been made, as stipulated by the treaty they could be made, and having the quality which, by judicial interpretation of such treaty and congressional acts, they were said to have

(the Torrey and Paine Cases, supra), we cannot ascribe to Congress any intent to do other than to recognize the situation just as it existed and to give to each allottee no more and no less than of right he was entitled to have. Therefore there is included in the proviso a clause for cutting down excessive, likewise for filling "short," allotments or selections. I view the proviso as a plain *confirmatory* declaration, binding both government and the tribe, to adhere to selections theretofore made as a fulfillment of treaty stipulations for allotments; and, instead of being a grant of authority to the executive officers charged with supervision of these allotments, it serves—as to selections made prior to the passage of the act—as a plain limitation on both parties. Of course, with respect to those members of the tribe who, when the act was passed, had not made selections, or whose selections were in excess or short of their right, the law gives authority to proceed; and it will not be contended that a member of the tribe who had not made a selection, had any right in severalty in the lands subject to allotment. But it seems clear that the purpose of the act was to accomplish—it would seem forthwith, just what has in fact been accomplished—the actual distribution of the tribal lands in fee simple, and to finally discharge the subsisting relation of guardian and ward, in so far, at least, as it involved a restriction upon the disposition of lands.

As heretofore observed, this necessitated, fundamentally, a declaration, either expressly or by implication, by the branch of the government having the power, that the restriction *be removed;* and it cannot be doubted that Congress not only had the power, but intended to and did exercise it in this enactment of 1906. The situation is not like that presented when Congress, instead of exercising its own discretionary power to remove the restriction, delegates it to the executive officials, with authority to exercise it by issuing a patent. In other words, Congress can, and in many instances does, either direct the issuance of patents which upon their face show the restraint imposed and the duration thereof, or, in like manner, the issuance of allotments with power, thereafter, in the Secretary of the Interior, *in his discretion,* to issue patents. In the former the restraint lifts automatically with the expiration of the time prescribed; in the latter, usually by the act of the executive official in issuing the patent as the evidence of the exercise of his discretion. But when Congress itself assumes to exercise the discretion, there can be no other way of evidencing it than by passing a law directing the issuance of an absolute patent. The law itself is the final act of surrender by the government of its reserved discretionary power over the land. The government had nothing to do, as between itself and the Indians who had actually received allotments, except to continue or to release the restriction. Suppose, for example, the original terms of the treaty giving to the President the power, after 10 years, or generally, the right, in his discretion, to raise the restriction, had been deemed in force. Manifestly, he might have exercised the power by merely issuing a patent to an individual allottee. But if, instead of doing so, he had issued a general proclamation declaring that the tribe had

advanced sufficiently to entitle the allottees to a discharge of the restrictions against their several lands, can there be any doubt that such a proclamation would have been the executive act of discharge, even though a patent never issued? And would not the patent, when issued, grant to the allottees what they owned, plus the discharge derived through the executive proclamation? What, if anything, do these present allottees acquire under their patents greater than that which Congress intended they should have the moment the act of 1906 received executive approval?

If by the treaty and prior legislative acts they had not acquired a status as owners, subject only to the restrictions against alienation, as indicated in the Paine and Torrey Cases, if Congress looked upon these Indians as occupiers, and did not intend by the act of 1906 to lift the restraints, then there was no occasion for the passage of the act. In other words, if, after its passage, the restraint was still to rest on the allotted lands until the President or the Secretary of the Interior, in his *discretion*, issued the patent, then the law added nothing to the situation. Putting the query last above made in another way: Upon the passage of this act of 1906, and when ascertaining the fact that Mary Butler Tousey made a selection in 1899, and therefore was an allottee within the express terms of the act, by what authority, and for how long could any executive official withhold the patent— what claim against her *right* to the patent could be asserted? Ballinger v. United States ex rel. Frost, 216 U. S. 240, 30 Sup. Ct. 338, 54 L. Ed. 464. I am satisfied that nothing but the ministerial duty of issuing the patent remained to be discharged, and that such patent, no matter how long its issue may have been delayed, granted the fee as of the date of the congressional discharge of the restriction and the mandatory direction for patenting, and that the deed from her to the defendant conveyed the fee; that, the government control or reserved power over the alienation having been surrendered or exhausted, the patent, though issued and delivered later, in law inures to the benefit of the defendant, Anderson, and he must prevail in this suit.

Consideration of the other questions argued by counsel is therefore unnecessary. Whether the view expressed in this opinion leads to a decree dismissing the bill for want of equity, or for lack of jurisdiction, is a matter upon which further arguments can be presented when the decree is to be entered.