STATE of Wisconsin, Plaintiff-Respondent,†

v.

Bert W. DAVIDS, Defendant-Appellant.

Court of Appeals

*No. 93–1901. Oral argument January 5, 1994.—Decided February 1, 1994.*

(Also reported in 514 N.W.2d 23.)

†Petition to review granted.

188

On behalf of defendant-appellant, the cause was submitted on the briefs of *John M. Wiley* of Wausau and *Sharon L. Greene* of Bowler.

On behalf of plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *John D. Niemisto*, assistant attorney general, of Madison.

Before Cane, P.J., LaRocque and Myse, JJ.

LaROCQUE, J. Bert Davids, an enrolled member of the Stockbridge-Munsee Indians, appeals a judgment of conviction for violation of § 29.09(1), STATS., fishing without a license. Davids argues that the State lacks jurisdiction to convict him of fishing without a license under § 29.09(1).[1] Specifically, Davids claims that the 1856 Treaty between the Stockbridge-Munsee and the United States created a reservation and gave tribal members the right to hunt and fish within the boundaries created by the Treaty. He asserts that Congress never diminished or disestablished the reservation boundaries, or terminated the Tribe's hunting and fishing rights within those boundaries. Because he was exercising his treaty-given rights to fish within those boundaries, Davids concludes that he was fishing within Indian country and

---

[1] Section 29.09(1), STATS., states:

Except as specifically provided otherwise by s. 29.155(1) or another section of this chapter, no person may hunt any wild animal, trap any game or fish for fish in the waters of this state unless the appropriate approval is issued to the person. A person shall carry the required approval with him or her at all times while hunting, trapping or fishing unless otherwise required by another section of this chapter or unless otherwise authorized or required by the department. A person shall exhibit the approval to the department or its wardens on demand.

that the State lacks jurisdiction over him. We agree with Davids and reverse the conviction.

On May 5, 1991, Davids was cited by a Wisconsin Department of Natural Resources warden for fishing at Upper Gresham pond without a fishing license in violation of § 29.09(1), STATS. The pond is located within the boundaries of the Stockbridge-Munsee Indian reservation as created by the 1856 Treaty. Davids challenged the citation and moved to dismiss, arguing that the State lacked subject matter jurisdiction because he was exercising a treaty-based right to fish within Indian country.

The trial court concluded that it had jurisdiction, denied his motion and convicted him of violating § 29.09(1), STATS. The court's jurisdictional analysis was based on its review of the legislative history and effect of a series of congressional acts. The court agreed that the 1856 Treaty between the Stockbridge-Munsee and the United States established a reservation on the present day towns of Bartelme and Red Springs. This reservation encompassed Upper Gresham pond. The court also apparently assumed that the Treaty gave the Tribe hunting and fishing rights within those boundaries.

However, the court concluded that an 1871 Act of Congress diminished the reservation boundaries and that the pond was outside the diminished reservation. It further concluded that a 1906 Act terminated the remaining reservation, and that this termination simultaneously terminated the Tribe's hunting and fishing rights. The court concluded that a new, and smaller, reservation was created in the 1930s within the boundaries of the original reservation. The court held that the new reservation gave the Tribe hunting and fishing rights within those boundaries, but,

because Upper Gresham pond is not located within the new reservation, the court held that the State had exclusive jurisdiction over hunting and fishing on those lands.

On appeal, Davids argues that the Acts the trial court relied upon did not diminish or disestablish the reservation boundaries, nor did they extinguish treaty-given rights to hunt and fish within those boundaries. The State's arguments mirror the trial court's reasoning and conclusions.

The State's jurisdiction to regulate Stockbridge-Munsee fishing on Upper Gresham pond hinges upon whether the pond is in Indian country within the meaning of 18 U.S.C.A. § 1151 (1984). That section includes in the definition of Indian country "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwith-standing the issuance of any patent . . . ." The State concedes that if the pond is within the Tribe's reservation boundaries, and thus within Indian country, it has no jurisdiction.[2]

---

[2] The State lacks jurisdiction over fishing, as well as hunting and trapping, on reservation land for several reasons. First, § 29.025, STATS., states "American Indians hunting, trapping, or fishing off Indian reservation lands are subject to this chapter." Thus, by implication, ch. 29 is inapplicable to Indians who hunt, fish and trap on reservation lands. Second, and relatedly, 18 U.S.C.A. § 1162(a) (1984) giving Wisconsin jurisdiction "over offenses committed by or against Indians in the areas of Indian country" within the State specifically prevents the State from depriving "any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof." *Id.* at subsec. (b). Finally, the State's jurisdiction is arguably pre-empted because the tribe has enacted its own fish and game

It is undisputed that the Treaty of 1856 created a reservation encompassing the towns of Bartelme and Red Springs, and that this reservation included Upper Gresham pond. It is further undisputed that the Treaty gave the Tribe the right to hunt and fish within those boundaries. However, the pond's status depends upon whether the original reservation boundaries remain unchanged or whether they were diminished, disestablished and reestablished by congressional acts. Whether reservation boundaries have been diminished or disestablished by congressional act is a question of law. We review questions of law de novo. *Brown County Attorneys Ass'n v. Brown County*, 169 Wis. 2d 737, 741, 487 N.W.2d 312, 313 (Ct. App. 1992).

We begin by reviewing some well-established legal principles. The first of these is that only Congress can divest a reservation of its land and diminish its boundaries. Once a reservation is created, no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise. *Solem v. Bartlett*, 465 U.S. 463, 470 (1984); *see also State v. Webster*, 114 Wis. 2d 418, 430, 338 N.W.2d 474, 480 (1983).

Additionally, diminishment is not lightly found, but requires an Act that clearly evinces congressional intent to change boundaries. *Solem*, 465 U.S. at 470. This is important because toward the end of the nineteenth century, the assumption in Congress was that

laws which, if construed as an exercise of its sovereign power over its reservation, precludes the exercise of state fish and game laws within the reservation. *See, e.g., St. Germaine v. Chapman*, 178 Wis. 2d 869, 505 N.W.2d 450 (Ct. App. 1993).

Indian tribes would shortly enter traditional American society and the reservation system would cease to exist. Consequently, Congress was not always meticulous in specifying whether particular legislation formally sliced off a parcel of a reservation. *Id.* at 468. Yet the courts have never extrapolated an intent to diminish reservation boundaries in a specific act from this general congressional understanding and carelessness. Rather, courts must always examine each act for clear evidence of congressional intent to diminish before diminishment is found. *Id.* at 468-69.[3]

[3] The dissent's reliance on *Montana v. United States*, 450 U.S. 544 (1981), is misplaced for two reasons. First, the dissent's quotation is a reference to Congress' understanding of the effect of the General Allotment Act of 1887, 24 Stat. 388. Neither party argues this Act is relevant to the issue before this court, nor could they because congressional intent in 1887 cannot be imputed to the 1871 Act passed sixteen years earlier. If the General Allotment Act is relevant at all, it is as another example of Congress' general understanding about the future of the reservation system. Yet as we have just noted, *Solem v. Bartlett*, 465 U.S. 463, 468-69 (1984), places no significance on the general understanding but requires a specific indication of its intent to diminish a reservations boundaries.

Second, *Montana* involved the question of whether the Tribe retained the jurisdiction to enforce its hunting and fishing laws against non-Indians living on allotted land that was within its reservation. The case does not suggest that allotments diminished the reservation boundaries, but rather that the Tribe lost jurisdiction to enforce its laws on non-Indians on those lands. Presumably, because these lands remained within the reservation boundaries, the Tribe retained the right to hunt and fish on allotted lands, subject to the owner's permission, free from State jurisdiction.

There are three primary factors to consider in determining congressional intent to diminish reservation boundaries: "the face of the relevant act, events surrounding its passage, including legislative history, and subsequent treatment of the land." *United States v. Grey Bear*, 828 F.2d 1286, 1289 (8th Cir. 1987). The most probative evidence of intent is the statutory language used in the act. "Explicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation" certain lands. *Solem*, 465 U.S. at 470. When such language is buttressed by an unconditional commitment from Congress to compensate a tribe for its land, there is almost an insurmountable presumption of congressional intent to diminish. *Id.* at 470-71.

Clear examples of explicit language evincing an intent to diminish reservation boundaries exist. In *DeCoteau v. District County Court for Tenth Jud. Dist.*, 420 U.S. 425, 437 (1975), the Court found a Sioux agreement to "cede, sell, relinquish, and convey to the United States all the unallotted land within the reservation" evinced an intent to diminish the boundaries. In *Mattz v. Arnett*, 412 U.S. 481, 504 n.22 (1973), Justice Blackmun cited three examples of such language: 15 Stat. 221 (1868) ("the Smith River reservation is hereby discontinued"); 27 Stat. 63 (1892) (a portion of the Colville Indian Reservation is "vacated and restored to the public domain"); 33 Stat. 218 (1904) ("the reservation lines of the said Ponca and Otoe and Missouria Indian reservations be, and the same are hereby abolished").

However, explicit language of cession is not a prerequisite for finding diminishment. *Solem*, 465 U.S. at 471. An intent to diminish may be inferred when events surrounding passage of an act unequivocally reveal a widely held contemporaneous understanding that the affected reservation would shrink. *Id.* Additionally, treatment of an affected area by Congress and the Bureau of Indian Affairs, particularly in the years immediately following the opening of an area, has some evidentiary value in discerning congressional intent. *Id.* However, when an act and its legislative history fail to provide substantial and compelling evidence of a congressional intent to diminish, the traditional solicitude due Indian tribes compels us to rule that diminishment did not take place and that a reservation's boundaries survived an opening. *Id.* at 472; *see also Webster*, 114 Wis. 2d at 430, 338 N.W.2d at 480.

## THE ACT OF 1871

We first apply these principles to the Act of Feb. 6, 1871, ch. 38, 16 STAT. 404. That Act was designed to resolve a dispute between two factions of the Stockbridge-Munsee Tribe. The factions, known as the Citizen party and the Indian party, had a long history of disputes. Members of the Citizen party were Stockbridge-Munsee Indians who wished to separate themselves from the Tribe and become citizens of the United States. The Indian party members wished to retain their tribal character and continue under the care and guardianship of the United States. *Id.* at § 6.

The Act attempted to resolve the dispute in the following manner: Under the supervision of the Secretary of the Interior, reservation land within the 1856 boundaries was appraised and auctioned off in eighty-

acre lots, with the exception of eighteen sections of land. *Id.* at §§ 1, 2. Money raised from the sale was divided between the Citizen and Indian parties in proportion to the number of Indians in each party. The Citizen party's portion of money from the sale was equally divided among them per capita, and paid to the head of families and adult members. *Id.* at § 5. The payment was held

> *as a full surrender and relinquishment on the part of the citizen party*, each and every one of them, of all claims to be thereafter known or considered as members of said tribe, or in any manner interested in any provision heretofore or hereafter to be made by any treaty or law of the United States for the benefit of said tribes, and they and their descendants shall thenceforth be admitted to all the rights and privileges of citizens of the United States.

*Id.* at § 6 (emphasis added).

The portion due to the Indian party was held in trust for them by the United States. *Id.* at § 5. The Act went on to hold that these Indians "may be located *upon lands reserved by the second section of this act, or such other reservation* as may be procured for them . . . ." *Id.* at § 7 (emphasis added). The second section of the Act authorized the Secretary of the Interior to "reserve from sale" eighteen sections of land. The Act also provided that "as soon as practicable, *after a suitable and permanent reservation shall be obtained and accepted by said tribe, either at their present home or elsewhere,* the same shall . . . be surveyed and subdivided . . . ." *Id.* at § 8 (emphasis added). Following subdivision, allotments from the land were to be made to tribal members.

Our review of the 1871 Act does not disclose any clear language of cession of reservation boundaries resembling the examples cited earlier. Furthermore, we can find no unconditional congressional commitment to compensate the Tribe for its lands. *Solem* suggests this requires guarantee of a certain amount of compensation. *Id.* at 469 n.10. Where, however, the compensation is uncertain and the Secretary of the Interior is authorized to conduct the sale of the land and credit the Tribe with the proceeds, the Secretary is merely acting as a sales agent for the Tribe and there is no evidence of an unconditional commitment to compensate the Tribe for diminished lands. *Id.* at 469 n.10, 473 (citing *Seymour v. Superintendent*, 368 U.S. 351, 356 (1962)). Because the amount of compensation guaranteed by the auction was uncertain, and because the Secretary was authorized to conduct the sale and credit accounts, we conclude that the Secretary was merely acting as the Tribe's sales agent.[4]

---

[4] Justice Marshall noted in *Solem v. Bartlett*, 465 U.S. 463 (1984), that *Seymour v. Superintendent*, 368 U.S. 351 (1962), was a good illustration of when a surplus land act did not diminish reservation boundaries.

> At the other extreme, the Act of Mar. 22, 1906, ch. 1126, § 1, 34 Stat. 80, simply authorized the Secretary of the Interior to "sell or dispose of" unallotted lands on a portion of the Colville Indian Reservation; under the Act, the Colville Tribe received whatever proceeds these sales generated, rather than a sum certain. § 9, 34 Stat. 81. In *Seymour . . .* we held that, because the Colville Act lacked an unconditional divestiture of Indian interest in the lands, the Act simply opened a portion of the Colville Reservation to non-Indian settlers and did not diminish the reservation.

*Solem*, 465 U.S. at 468 n.10. While the 1871 Act was not a land surplus act, we believe its compensation structure resembles

The State argues that the language from the Act placing the Indian party on the eighteen sections reserved from sale, when placed in historical context, evinces a clear intent to create a new reservation for the Indian party. Specifically, in the 1840s and 1850s, the Tribe was located on a reservation encompassing two townships on the edge of Lake Winnebago. However, continual infighting among tribal factions led Congress to enter into a Treaty in 1848 whereby the Tribe would remove to a new reservation in Minnesota. A majority of the Tribe, however, refused to remove and wished to move to a new reservation in Wisconsin. Still others preferred to disassociate themselves from the Tribe altogether. Treaty with the Stockbridge and Munsee, 1856, pmbl., 11 STAT. 663.

Finally, in 1856, Congress and the Tribe entered into a new treaty whereby those members of the Tribe wishing to remove to a new location were given the reservation at Bartelme and Red Springs. Those who wished to disassociate themselves from the Tribe were given patents to land at the town of Stockbridge in exchange for ceding and relinquishing to the United States all their rights as members of the Tribe. *Id*. at ART. 16.

The State argues that seen through this historical context, the 1871 Act clearly was intended to do what the 1856 Treaty did: make citizens of those who no longer wished to be part of the Tribe and locate the remaining Tribe on a new reservation, either in Minnesota or a diminished reservation at their present location. We believe this is a plausible interpretation of congressional intent behind the 1871 Act. We cannot say, however, that Congress clearly intended this. It is

the Colville Act of *Seymour*, which Justice Marshall said was an example of an Act that did not diminish reservation boundaries.

equally plausible that Congress sought to resolve the dispute by giving Indian party members the choice of either removing to a new reservation or remaining within the unchanged 1856 boundaries on the remaining eighteen sections of land held in trust for them.

Prior to 1871, Congress had a history of disestablishing Stockbridge-Munsee reservations in unequivocal terms. The 1839 Treaty begins: "The Stockbridge and Munsee tribes of Indians (formerly of New York) *hereby cede and relinquish to the United States,* the east half of the tract of forty-six thousand and eighty acres of land, which was laid off for their use . . . ." Treaty with the Stockbridge and Munsee, 1839, 7 STAT. 580, 11 STAT. 577 (emphasis added). Similarly, the 1856 Treaty disestablishing the reservation on Lake Winnebago stated that "[t]he Stockbridge and Munsee tribes . . . and all the individual members of said tribes, *hereby jointly and severally cede and relinquish to the United States all their remaining right and title in the lands at the town of Stockbridge . . . .*" Treaty with the Stockbridge and Munsee, *supra,* ART. 1 (emphasis added). It is evident that Congress, in its prior dealings with the Stockbridge-Munsee, was in the habit of using clear language of cession to disestablish previous reservations.[5] Even the 1871 Act used clear

---

[5] Even the Treaty with the Menominee, 1856, 11 Stat. 679, used clear language of cession. This treaty disestablished a portion of the Menominee reservation so that Congress could create the Stockbridge-Munsee reservation at the towns of Bartelme and Red Springs. Article 1 of the treaty states: "The Menomonee tribe of Indians *cede to the United States a tract of land,* not to exceed two townships in extent . . . for the purpose of locating thereon the Stockbridge and Munsee Indians . . . ." (Emphasis added.)

201

and unambiguous cession language to terminate the Citizen party's membership in the Tribe and its members' tribal rights vis-a-vis the United States. In the absence of similarly clear language ceding the Tribe's reservation boundaries, and in the face of that Act's ambiguous meaning, we decline to hold that Congress clearly evinced its intent to diminish the 1856 reservation. *See, e.g., Mattz,* 412 U.S. at 504.

## THE ACT OF 1906

The Act of June 21, 1906, ch. 3504, 34 STAT. 382, declared that "members of the Stockbridge and Munsee tribe of Indians . . . shall, under the direction of the Secretary of the Interior, be given allotments of land and patents therefor in fee simple . . . ." The Act made allotments from all the available land in the reservation until available reservation land was exhausted. This available land came from unalloted land within the eighteen sections of land reserved from sale by the 1871 Act. As with the 1871 Act, the 1906 Act does not use cession language similar to the clear cession language used in the previously cited treaties; the statutory language does not clearly evince an intent to diminish or disestablish the reservation.

The State argues that this Act, when read in context with the 1871 Act diminishing the reservation boundaries, was intended to disestablish the remaining diminished reservation. Having held that the 1871 Act does not clearly evince an intent to diminish the reservation boundaries, the State's argument loses some of its force. The State also relies on the fact that this Act was the result of an agreement between the Stockbridge-Munsee and the United States. Apparently, a majority of the Tribe's males had petitioned the government with a proposed plan to settle the Tribe's

affairs. Pursuant to the plan, they petitioned for a patenting of all remaining tribal land and agreed to

> accept the following conditions as a full and complete settlement of all obligations of the Government, of whatever nature or kind, either expressed or implied, from whatever source the same may have accrued . . . and upon performance by the Government of said conditions any and all claims, grievances, and rights which we may have or claim to have against the Government . . . shall be deemed to have been fully paid, satisfied, and discharged.[6]

Even assuming this agreement would have dissolved the Tribe and disestablished the reservation, Congress never ratified the agreement. Legislation was twice introduced to Congress for the purpose of "carrying into full force and effect the intent and meaning of said agreement," and both times the legislation failed.[7] The 1906 Act makes no mention of the Tribe's offer, but rather merely issued fee patents to members for the remaining unallotted land on the reservation. However, the issuance of allotments and patents cannot by itself serve to disestablish reservation boundaries. Under 18 U.S.C. § 1151 (1984), Indian country includes reservations "notwithstanding the issuance of any patent . . . ." *Mattz*, 412 U.S. at 504. Thus, we conclude that nothing in the language or the legislative history of the 1906 Act evinces a clear congressional intent to disestablish the remaining

---

[6] S. REP. No. 173, 58th Cong., 2d Sess., 21 (1904).

[7] The first bill (S. 3620) was introduced in the 57th Congress in 1902. The second bill (S. 335) was introduced in the 58th Congress in 1903. S. REP. No. 173, *supra* note 6, at 2, 17.

boundaries as they existed when created by the Treaty of 1856.

Our conclusion that the reservation was never disestablished, or the Tribe dissolved, is buttressed by subsequent treatment by the Bureau of Indian Affairs. In a 1974 letter to the chairman of the Tribe, the acting commissioner of Indian Affairs from the Department of the Interior's Bureau of Indian Affairs expressed his opinion that Congress never clearly evinced an intent to diminish or disestablish the reservation, and that the 1856 boundaries remained intact. A similar opinion was expressed by the acting director of the Bureau of Indian Affairs' Office of Trust Responsibilities in a 1980 letter to the town clerk of Red Springs.

Additionally, current maps issued by the Department of Interior show the Stockbridge-Munsee reservation boundaries as they were established in 1856. One of these maps is a United States Geological Survey Map of Gresham Quadrangle, 7.5 minute series. The other is a Bureau of Indian Affairs Great Lakes Agency map of the present reservation. While we disagree with Davids' assertion that the letters and maps are themselves dispositive of the issue of the present reservation boundaries, they constitute some evidence that Congress never evinced a clear intent to, and thus did not, diminish the 1856 boundaries.

Because the reservation boundaries were never diminished, Davids was fishing within Indian country. Because the State has conceded the Tribe has the right to hunt and fish free of State interference in Indian country, we conclude that the State had no jurisdiction to cite Davids for violation of § 29.09(1), STATS. Accordingly, the conviction is reversed.

*By the Court.*—Judgment reversed.

CANE, P.J. (*dissenting*). The issue in this case is whether the Stockbridge-Munsee Tribe has a right to fish free of state regulation outside the Tribe's present reservation boundaries, but within the boundaries originally created by the Treaty of 1856.[1] The majority concludes that it does; I disagree. The majority's conclusion is contrary to the Tribe's history and the legal effect of the federal government's allotment policy as it existed in the late 1800s and early 1900s.

There is no factual dispute that the area where Bert Davids was cited for fishing without a valid Wisconsin fishing license is outside the Tribe's present reservation, but within the boundaries of the reservation as it existed until the Act of 1871.[2] There is also no dispute that Davids is an enrolled member of the Stockbridge-Munsee Tribe. What is disputed is whether the Tribe's reservation boundaries as Congress established in the 1856 Treaty shrunk by virtue of the Act of 1871 and with it the Tribe's hunting and fishing rights. Also disputed is whether any reservation status continued after 1910 when the final allotments were completed and before the 1934 Indian Reorganization Act.[3]

I conclude that the Act of 1871 shrunk the Tribe's reservation boundaries to the eighteen sections as described in the Act. It also shrunk the fishing and hunting rights to the reduced reservation boundaries. Additionally, by 1910, when all the allotments were

---

[1] Treaty with the Stockbridge and Munsee, 1856, pmbl., 11 STAT. 663.

[2] Act of Feb. 6, 1871, ch. 38, 16 STAT. 404.

[3] Act of June 18, 1934, 48 STAT. 984.

completed, the Tribe's reservation status terminated by virtue of the Act of 1906 and with it all tribal hunting and fishing rights. The Tribe did not secure reservation status again until the 1934 Indian Reorganization Act, and its present boundaries do not encompass the area where Davids was fishing. I would therefore affirm the trial court's judgment.

Unfortunately, the judiciary's failure to develop a consistent standard to determine whether a Tribe's reservation status along with the Tribe's fishing and hunting rights is dissolved has made these decisions more difficult. I contend that we must view this question in light of how the Tribes and Congress dissolved the reservations at the time of these congressional Acts. Also, we must not close our eyes to the reality of what was happening when these Acts were passed.

In its opinion, the majority cites much of the Tribe's history and I will not repeat all of it here. Additionally, a summary of the Tribe's history is reported in 69 Op. Att'y Gen. 72-87 (1980). My disagreement with the majority is that it relies solely on whether Congress explicitly in the Acts of 1871 and 1906[4] dissolved the reservation. In *United States v. Grey Bear,* 828 F.2d 1286 (8th Cir. 1987), the court identified three primary factors to consider in determining congressional intent with respect to disestablishment or termination of reservation rights: (1) the face of the relevant act, (2) events surrounding its passage, including legislative history, and (3) subsequent treatment of the land. *Id.* at 1289 (citing *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 587 (1977)). My position is that the circumstances surrounding the Acts and the nature of the allotments and patents demonstrate unequivocally that Congress

---

[4] Act of June 21, 1906, ch. 3504, 34 STAT. 382.

reduced the Tribe's boundaries in the late 1870s along with the fishing and hunting rights and then finally dissolved the Tribe and its reservation status by 1910.

The policy of the Allotment Acts in the late 1800s and early 1900s was the gradual extinction of Indian reservations and Indian titles and the eventual assimilation of the Indian population. *Montana v. United States*, 450 U.S. 544, 559 (1981). This allotment policy and sale of surplus reservation land was later repudiated in 1934 by the Indian Reorganization Act. However, because we are asked to interpret congressional Acts of 1871 and 1906, what is relevant in this case is the effect of the land alienation during the late 1800s and early 1900s.

In *Montana,* the United States Supreme Court addressed the effect of the federal allotment policies in the late 1800s when it stated:

> There is simply no suggestion in the legislative history that Congress intended that the non-Indians who would settle upon alienated allotted lands would be subject to tribal regulatory authority. *Indeed, throughout the congressional debates, allotment of Indian land was consistently equated with the dissolution of tribal affairs and jurisdiction.* It defies common sense to suppose that Congress would intend that non-Indians purchasing allotted lands would become subject to tribal jurisdiction when an avowed purpose of the allotment policy was the ultimate destruction of tribal government. And it is hardly likely that Congress could have imagined that the purpose of peaceful assimilation could be advanced if fee-holders could be excluded from fishing or hunting on their acquired property.

*Id.* (citations omitted) (emphasis added).

Here, the 1856 Treaty created a reservation for the Tribe and also provided for the allotment of parcels of land as part of a design to transfer ownership of a particular parcel of land to each tribal member. However, the government patents contained a restriction prohibiting the allottee from transferring or selling the parcel. Because of the ongoing feud between rival factions, the "Indian" party and the "Citizen" party, Congress by its Act of 1871 authorized the Secretary of the Interior to sell all of the reservation land in fee simple with no conditions at a public auction except for eighteen contiguous sections that were reserved for the "Indian" faction members. The Act further provided that these remaining eighteen sections or other reservation land (contemplated property in Minnesota) procured for them would become the reservation for the "Indian" faction members who would be known as the "Stockbridge tribe of Indians."

The "Indian" party rejected the proposed Minnesota property and claimed the remaining eighteen sections as its reservation. The Secretary of the Interior distributed the proceeds from the public sale to members of both factions with the "Citizen" party members taking their shares in money and becoming citizens while the "Indian" party members chose to retain their tribal relations and reservation status on the remaining eighteen sections and deposit their money in the United States Treasury to bear interest for its remaining tribal members.

Unfortunately, this did not resolve the dispute between the rival factions because an argument developed later that some persons reputed to be from the Citizen party sold their land and then illegally enrolled in the Indian party to receive the benefits of tribal annuities. *See* Marion Johnson Mochon, *Stockbridge-*

*Munsee Cultural Adaptations: "Assimilated Indians,"*
VOL. 112, NO. 3, PROCEEDINGS OF THE AMERICAN PHILO-
SOPHICAL SOCIETY, 204 (JUNE 1968). The Indian party
claimed that the eighteen section reservation belonged
to them and that an injustice was done when members
of the Citizen party were permitted to enroll in its
Tribe.[5]

I think it is noteworthy that in response to this
problem, in 1893, the Green Bay Agency reported to
the Commissioner of Indian Affairs that since the set-
tlement provided for in the Act of 1871, "many of those
who took their money and used it, with others, have
returned upon the *diminished* reservation and made
demand for a new division of the property of the rem-
nant of the tribe." *See id.* (citing SIXTY-SECOND ANNUAL
REPORT OF THE COMMISSIONER OF INDIAN AFFAIRS (WASH-
INGTON, GOVERNMENT PRINTING OFFICE) 341 (1893)
(emphasis added)).

There is no dispute that patenting *some* tribal
lands to individual tribal members standing alone does
not compel a conclusion that Congress intended to dis-
establish or dissolve a reservation status and with it
the Tribe's fishing and hunting rights. Even the State
concedes this. However, I do agree with the State that
the *total* patenting of all tribal lands in this case does
reflect congressional policy to disestablish reservation
status and along with it the Tribe's fishing and hunting
rights. Here, *all* the land within the boundaries of the
1856 Treaty had been sold in fee simple with no condi-
tions; the initial portion at a public auction and then

---

[5] History clearly shows that neither the Tribe nor the fed-
eral government ever considered that the Tribe's reservation
continued to include the land sold in fee simple to the public.
Their emphasis was only about the eighteen sections reserved
from this sale for the Tribe as a reservation. *See id.*

finally the remaining eighteen sections were allotted and patented by 1910 to the Indian faction. The Indians could do whatever they wanted with their land, and many of them sold their land to non-Indians as had many of the Indians from the Citizen faction done earlier. After the final patents were delivered in 1910, no tribal government existed.

Additionally, the federal cases of *United States v. Gardner,* 189 F. 690 (E.D. Wis. 1911), and *United States v. Anderson,* 225 F. 825 (E.D. Wis. 1915), are helpful in understanding the history surrounding the Stockbridge-Munsee Tribe in its relationship with the federal government and also what the community's understanding was shortly after the Act of 1906. In *Gardner,* the defendant was attempting to show that his alleged crime did not fall within federal jurisdiction. He contended, among other things, that after the Act of 1871 there was no longer any reservation formally set apart for the Tribe. The court rejected this argument by stating:

> The act of 1871 (Act Feb. 6, 1871, c. 38, 16 Stat. 404) provided for a severance of the two parties into which the Stockbridge and Munsee Indians had divided. The sale of the land and payment in cash to the so-called citizen party was provided for, *and provision made for a reservation for the other party.* And it was directed that a roll should be prepared showing who are the members of such tribe and a survey made and a subsequent allotment, such allotment to be returned to the Secretary of the Interior within one year; that the title to such reservation and of the lands described therein shall be held by the United States in trust for the individual Indians and their heirs, the surplus lands embraced in such reservation, remaining after making such

210

allotments, shall be held in like manner by the United States, subject to be allotted to individuals of said tribe who may not have received any portion of said reservation, or to be disposed of for the common benefit of said tribe. *Pursuant to this enactment the Indians continued to occupy this remnant of land as a reservation, under the charge of an Indian agent.*

*Id.* at 693 (emphasis added). This "remnant of land" was the remaining eighteen contiguous sections, not all the land within the Tribe's original boundaries.

The court in *Gardner* rejected the defendant's argument that at the time of his alleged offense the eighteen sections no longer constituted a reservation. It is important to note two things in the State's contention in that case. First, the State contended that it was the eighteen sections occupied by the Tribe that constituted the reservation and, second, these eighteen sections continued as a reservation, but only up to the time the last remnant of land was distributed and conveyed. This contention was consistent with the allotment policies and its legal effect at that time. The *Gardner* court agreed and recognized the well-settled principle of law as it existed in 1911 when it stated:

> It may be conceded that when Congress had authorized the allotment in severalty and in fee simple of all the lands belonging to the tribe, and after the approval of such allotment and the actual delivery of the patents therefor, there remained no reservation, but that each allottee in fee simple had become thereby a citizen of the United States, and a citizen of the state in which he resides and amenable to the laws of the state.

*Id.* at 694.

The *Gardner* court cited *Bates v. Clark,* 95 U.S. 471 (1877), where the United States Supreme Court stated:

> The simple criterion is, that [the land in dispute] was Indian country whenever the Indian title had not been extinguished, and it continued to be Indian country so long as the Indians had title to it, and no longer. As soon as they parted with the title, it ceased to be Indian country without any further Act of Congress, unless by the Treaty by which the Indians parted with their title, or by some Act of Congress, a different rule was made applicable to the case.

*Id.* at 694.

The Court went on to note that there was no treaty or agreement with the Tribe extending the federal government's jurisdiction beyond the allotment in severalty. *Id.* at 695. Finally, the Court concluded that the reservation expired, but it need not determine the exact date because the alleged crime had occurred before the final patents were delivered and while the reservation still existed.

Four years later, in *Anderson,* 225 F. at 825, the court (although a different judge) again considered the effect of the 1906 legislation on the reservation status and concluded: "The Stockbridge and Munsee reservation, created by treaty and congressional acts, has been dissolved through the patenting in fee simple of the lands comprising the same to the members of the tribe, pursuant to Act Cong. June 21, 1906 . . . ." Again, we should note that the court in *Anderson* was only concerned with whether the remaining eighteen sections remained a reservation as a result of the 1906 Act and concluded that it did not.

Finally, in *Oregon Dept. of Fish & Wildlife v. Klamath Indian Tribe,* 473 U.S. 753 (1985), the Supreme Court was faced with the situation whether hunting and fishing rights continued to exist on the land severed from the original reservation. With little discussion, the Court concluded that the sale of land without any reservation of rights the Tribe had ceded to the United States diminished the boundaries of the original reservation. *Id.* at 768. The Court also rejected the Tribe's asserted right to hunt and fish on the land severed from the original reservation. It stated:

> In sum, the language of the 1864 Treaty indicates that the Tribe's rights to hunt and fish were restricted to the reservation. The broad language used in the 1901 Agreement, virtually identical to that used to extinguish off-reservation rights in the 1864 Treaty, accomplished a diminution of the reservation boundaries, and no language in the 1901 Agreement evidences any intent to preserve special off-reservation hunting or fishing rights for the Tribe. Indeed, in light of the 1901 diminution, *a silent preservation of off-reservation rights would have been inconsistent with the broad language of cession as well as with the Tribe's 1864 Treaty agreement to remain within the reservation.*

*Id.* at 770 (emphasis added).

These cases demonstrate both historically and legally that the Tribe's original reservation boundaries were diminished to the eighteen sections as a result of the Act of 1871. Additionally, because all but the eighteen sections were sold by fee simple to the public with no reservation of the Tribe's hunting and fishing rights, there remained no tribal reservation rights to hunt and fish on the land severed from the original reservation. Here, it appears undisputed that Davids

213

was cited for fishing without a license on land outside the remaining eighteen sections retained as the reservation.

Finally, it also appears clear that by virtue of the 1906 Act when the final patents (again in fee simple with no reservation of tribal rights) were delivered in 1910 under the allotment policy and its legal effect as existing in the late 1800s and early 1900s, not only the remaining eighteen sections but all the land within the original reservation boundaries no longer constituted a reservation. There was simply no reservation existing at all until it was reestablished under the 1934 Indian Reorganization Act when land was reacquired for the Tribe. I would therefore affirm the trial court's judgment.