STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Bert W. DAVIDS, Defendant-Appellant.

Supreme Court

*No. 93–1901. Oral argument January 11, 1995.—Decided June 27, 1995.*

(Also reported in 534 N.W.2d 70.)

For the plaintiff-respondent-petitioner the cause was argued by *John D. Niemisto,* assistant attorney general, with whom on the briefs was *James E. Doyle,* attorney general.

For the defendant-appellant there was a brief by *Kimberly M. Vele* and *Vele & McKittrick,* Evansville and oral argument by *Kimberly M. Vele.*

Amicus curiae was filed by *Truman Q. McNulty, Richard J. Sankovitz* and *Whyte, Hirschboeck, Dudek, S.C.,* Milwaukee, for the Wisconsin Counties Association.

JANINE P. GESKE, J.   This is a review of a published decision of the court of appeals, *State v. Davids,* 182 Wis. 2d 186, 514 N.W.2d 23 (Ct. App. 1994), which reversed the judgment of the circuit court for Shawano County, Thomas G. Grover, Circuit Judge. The issue before the circuit court was whether the Stockbridge-Munsee reservation, as its boundaries were defined by the Treaty of 1856, was diminished[1] by federal legislation in 1871 and terminated by federal legislation in 1906, thereby placing the area encompassing Upper Gresham Pond under state jurisdiction and requiring all who fished there to have a valid state fishing license, including Bert W. Davids (Davids), an enrolled

---

[1] The term "diminishment" is used in this case to describe the reduction in size of the reservation.

member of the Stockbridge-Munsee Tribe of Indians (the Tribe). In a decision and order dated December 7, 1992, the circuit court concluded that Davids violated § 29.09(1), Stats. (1991–92), [2] and found that (a) the reservation established by the Treaty of 1856 had been diminished by the Act of February 6, 1871, ch. 38, 16 Stat. 404, pursuant to which all but 18 sections of the reservation were sold as a means of settling an ongoing dispute between two factions of the Tribe;[3] (b) nothing in the Act of 1871 preserved hunting and fishing rights outside the diminished reservation; (c) the Act of June 21, 1906, ch. 3504, 34 Stat. 382, had the effect of terminating the Tribe's reservation status when the remaining reservation lands were patented in fee simple to tribal members; (d) the Indian Reorganization Act of 1934, 25 U.S.C. § 461, *et seq.,* did not provide for hunting and fishing rights outside reestablished reservation boundaries; and (e) since Upper Gresham Pond, the waters on which Davids was fishing, was located outside current reservation boundaries, the state had exclusive jurisdiction over hunting and fishing on

---

[2] Section 29.09(1), Stats. (1991–92), provides:

**29.09 Hunting, trapping and fishing; licenses and other approvals; issuance. (1)** LICENSE OR OTHER APPROVAL REQUIRED FOR HUNTING, TRAPPING OR FISHING. Except as specifically provided otherwise by s. 29.155(1) or another section of this chapter, no person may hunt any wild animal, trap any game or fish for fish in the waters of this state unless the appropriate approval is issued to the person. A person shall carry the required approval with him or her at all times while hunting, trapping or fishing unless otherwise required by another section of this chapter or unless otherwise authorized or required by the department [of natural resources]. A person shall exhibit the approval to the department or its wardens on demand.

[3] The circuit court also noted that the Upper Gresham Pond is not located within those 18 sections.

lands delineated in the Treaty of 1856. Accordingly, the circuit court found Davids to be subject to the laws of the state.

The court of appeals reversed the decision of the circuit court and held that the 1856 reservation boundaries were never diminished because: (a) the Act of 1871 did not clearly reflect congressional intent to diminish the reservation; (b) even if the intent to diminish existed, there was no unconditional congressional commitment to compensate the Tribe for its lands; and (c) neither the language nor the legislative history of the Act of 1906 reflects the "congressional intent to disestablish the remaining boundaries as they existed when created by the Treaty of 1856." *Davids,* 182 Wis. 2d at 203–04. The court of appeals concluded that Upper Gresham Pond was located within the Tribe's reservation boundaries as defined by the Treaty of 1856 and that, therefore, the state lacked personal and subject-matter jurisdiction over Davids.

The issue before this court is whether the Stockbridge-Munsee reservation, as its boundaries were defined by the Treaty of 1856, was diminished by federal legislation in 1871, thereby placing the area encompassing Upper Gresham Pond under state jurisdiction. To determine whether the reservation has been diminished, this court examined the statutory language of the Act of 1871, as well as the historical context surrounding the passage of this and subsequent legislation. *See Hagen v. Utah,* 114 S. Ct. 958, 965 (1994). The Act of 1871 must be distinguished from typical surplus land acts of the 19th century, legislation which expressly required Indian tribes to cede and relinquish tribal lands in exchange for just compensation, after which the lands were returned to the public domain for white settlement and homesteading. The

391

Act of 1871, however, had a decidedly different purpose: it was intended to provide the Stockbridge-Munsee Tribe with relief from decades of intratribal strife and factionalism by means of the sale of tribal lands and disbursement of assets among tribal members. An examination of treaties and federal legislation enacted prior to and subsequent to the passage of the Act supports the finding that Congress, in response to continued requests by the Tribe, intended to diminish the size of the 1856 reservation. Accordingly, we now reverse the decision of the court of appeals and hold that: (a) the provisions of the Act of 1871 diminished the size of the Tribe's reservation, the boundaries of which were established by the Treaty of 1856; (b) current tribal jurisdiction over hunting and fishing rights is confined to the boundaries of the reservation established in 1934; and (c) Upper Gresham Pond is located outside current reservation boundaries; therefore, Davids is subject to the state's jurisdiction.

## I.

Indian law is described as "the body of jurisprudence created by treaties, statutes, executive orders, court decisions and administrative action defining and implementing the relationship among the United States, Indian tribes and individuals, and the states." Felix S. Cohen, *Handbook of Federal Indian Law* 1 (1982 ed.). The development of Indian law in the 19th century was premised on the view that the relationship between the United States and Indian tribes was similar to the relationship between a guardian and his or her ward: "They look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the president as their great father." *Cherokee Nation v. Georgia,* 30 U.S. (5

Pet.) 1, 17 (1831). Treaties and federal legislation during this period reflected the additional belief that "termination of tribal life was necessary if the Indian was to participate fully in the American system." *Handbook of Federal Indian Law* 131 (citing Comm'r Ind. Aff. Ann. Rep., H.R. Exec. Doc. No. 1, 51st Cong., 1st Sess. 3–4 (1889) ("tribal relations should be broken up, socialism destroyed, and the family and the autonomy of the individual substituted")).

Assimilation into the "American system" required Indian tribes to adopt the white man's view of property—the private ownership of land. *Handbook of Federal Indian Law* 131–32. Thus, between 1853 and 1900, communal or tribal ownership of the land was supplanted by a policy of allotment, converting some parcels into title held by individual tribal members, *id.* at 98, and returning surplus lands to the public domain for white settlement and expansion throughout the West.

By the beginning of the 20th century, the allotment policy was acknowledged to be a failure. Millions of acres of tribal lands were lost by means of misrepresentation or the sale of allotments to pay taxes. States also claimed jurisdiction over lands opened by federal surplus land acts, arguing that these acts had the effect of diminishing or terminating former reservations. Various Indian tribes subsequently turned to the courts to determine whether such legislation in fact diminished or terminated their reservations.

"[I]t is settled law that some surplus land Acts diminished reservations . . . and other surplus land Acts did not . . .." *Solem v. Bartlett,* 465 U.S. 463, 469 (1984) (citations omitted).[4] In *Solem,* the Supreme

---

[4] The Court stated that the legacy of surplus land acts has been "a spate of jurisdictional disputes between state and fed-

Court considered whether an "Act of Congress diminished the boundaries of the Cheyenne River Sioux Reservation or simply permitted non-Indians to settle within existing reservation boundaries." *Id.* at 464. Congress established this reservation in 1889 and then passed a surplus land act in 1908, opening a portion of the reservation for settlement by non-Indians. In 1979, Respondent, Bartlett, an enrolled member of the tribe, was convicted of attempted rape. He argued, however, that the state of North Dakota did not have jurisdiction over him because the crime occurred within the reservation, the boundaries of which had not changed since 1889.

In its decision, the Court began by identifying the governing principles of diminishment. First, "only Congress can divest a reservation of its land and diminish its boundaries." *Id.* at 470. Second, diminishment will not be lightly inferred. Rather, congressional legislation must "clearly evince an 'intent . . . to change . . . boundaries' before diminishment will be found." *Id.* (quoting *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 615 (1977)). Congressional intent to diminish is found in the statutory language, as well as in events surrounding and subsequent to the passage of a surplus

eral officials as to which sovereign has authority over lands that were opened by the Acts and have since passed out of Indian ownership." *Id.* at 467. As a practical matter, surplus land acts did not articulate whether the opened lands retained reservation status or extinguished all Indian interests. According to the Court, at the time the acts were passed, this distinction seemed to be unimportant. *Id.* at 468. Subsequent disputes have also been burdened by the turn-of-the-century presumption that Indian reservations were a thing of the past. *Id.*

land act. *Id.* at 470–71.[5] According to the Court, the surplus land act in question failed to include any reference to the cession of Indian interest in the opened lands or a desire to change existing reservation boundaries. *Id.* Consequently, the Court held that the reservation had not been diminished and the state lacked jurisdiction over Bartlett.

The Supreme Court, however, has, under other circumstances, held that the passage of federal surplus land acts did have the effect of diminishing or terminating reservations. In *DeCoteau v. District County Court,* 420 U.S. 425, 426–27 (1975), the Court considered the issue of whether "the Lake Traverse Indian Reservation in South Dakota, created by an 1867 treaty . . . was terminated and returned to the public domain, by the Act of March 3, 1891 . . .." In contrast to the surplus land act at issue in *Solem,* the act in this case contained explicit cession language, according to which "the Indians were willing to convey to the Government, for a sum certain, all of their interest in all of their unallotted lands." *DeCoteau,* 420 U.S. at 445. Further, the circumstances surrounding the passage of the act and the act's legislative history reflected the fact that the reservation was terminated in 1891. Thus, congressional intent was clear to overcome the general rule that doubtful expressions in congressional legislation are to be resolved in favor of the Indians. *Id.* at 444.[6]

---

[5] Other cases which have affirmed these principles and found that reservations have not been diminished include: *Antoine v. Washington,* 420 U.S. 194 (1975); *Mattz v. Arnett,* 412 U.S. 481 (1973); *Menominee Tribe v. United States,* 391 U.S. 404 (1968); and *Seymour v. Superintendent,* 368 U.S. 351 (1962).

[6] Other cases which have supported a finding of diminishment based on such evidence include: *Hagen v. Utah,* 114 S.Ct.

In each of the cases described above, the Supreme Court considered whether the policy of allotment and federally authorized surplus land acts diminished or terminated Indian reservations. That analysis can be distinguished from the situation faced by the Stockbridge-Munsee Tribe at the end of the 19th century. Though subject to the allotment policy, ultimate changes in reservation boundaries were not federally imposed (as with other Indian tribes), but sought by the Tribe itself. The history of the Tribe is characterized by a people who wished both to retain a tribal identity and to adapt to American customs and mores. This effort created an internal tension which resulted in the development of permanent factions. As will be discussed below, between 1843 and 1871, the Tribe made a series of requests to the federal government to resolve the internal dispute.

The particular facts which prompted our review are as follows. In May 1991, Davids was fishing on the waters of Upper Gresham Pond near the town of Gresham, Wisconsin. Cited by the Department of Natural Resources for fishing without a license, in violation of § 29.09(1), Stats. (1991–92), Davids maintained that he did not need a license because he was fishing within reservation boundaries. Whether or not this is so requires an examination of a long and unique tribal history. Accordingly, we recount those portions of the Tribe's history which determine whether the pond in question is located on reservation lands.

The current members of the Tribe are descendants of the Mohicans, who had settled along the Housatonic River in what is now Stockbridge, Massachusetts.

958 (1994); *Oregon Fish & Wildlife Dept. v. Klamath Tribe,* 473 U.S. 753 (1985); and *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584 (1977).

Members had a 125-year history of trading with the Dutch before their involvement with English settlers in the early 1700's. Patrick Frazier, *The Mohicans of Stockbridge* XI–XII (1992). The impact of trade on the Tribe's culture was significant, requiring a transition from hunting and subsistence farming to trade, trapping, and consumption of European goods. *Id.* at XII.

In 1734, English colonists established a mission community at Stockbridge for the purpose of converting and "civilizing" the native inhabitants. *See* Marion Johnson Mochon, *Stockbridge-Munsee Cultural Adaptations: "Assimilated Indians,"* vol. 112, No. 3, Proceedings of the American Philosophical Society 182 (June 1968) [hereinafter "Assimilated Indians"].

> The Mohicans' endurance of the mission at Stockbridge ... was pragmatic. The leaders realistically assessed the future and adapted to its approach accordingly. The mission provided a pause for the Indians—and more important, for their children and grandchildren—to adjust to the inevitable change in their way of living. By the third generation the Stockbridge Indians had absorbed enough European-American culture to try to manage on their own. Their parents and grandparents, however, like New World immigrants a century later, had to adjust to the problems of surviving in a dominant, alien culture that surrounded them faster than they would have chosen.

*The Mohicans of Stockbridge* 240.

By the end of the 18th century, colonial growth forced the Tribe to move from Stockbridge to New York, occupying lands provided by the Oneida Indians. Then, in 1821, Congress negotiated treaties with the Tribe and the Menominee Indians in the Territory of Wisconsin. At the time of its removal to Wisconsin in 1822, the

Tribe had been influenced by 50 years of European mission experience: members had so adapted to European religion, education, and technology that the Tribe's native language had not been spoken in two generations. *"Assimilated Indians"* at 183, 195, 200–01. Though acculturation placed the Tribe in the position of serving as "cultural brokers" between white and Indian cultures, it also caused intratribal conflict. *Id.* at 184.[7]

The conflict, which would last for the next 70 years, manifested itself in the development of two tribal factions: the Indian party and the Citizen party. The Indian party, though not in favor of a return to its aboriginal culture, wanted to preserve the Tribe's distinctive nature in the form of a traditional clan structure and community culture. By contrast, the Citizen party favored relinquishing tribal status in return for United States citizenship and the receipt of individual shares of tribal property in fee simple. *Id.* at 205.

Internal strife resulted in the following series of treaties and congressional acts which attempted to resolve the factional disputes:

---

[7] In *"Assimilated Indians"* at 190, the author suggests five factors which led to the ultimate breakdown of tribal integrity: (1) the demise of traditional clan organization with the introduction of the fur trade, requiring less reliance upon extended family members for survival; (2) the introduction of the European concept of property, emphasizing individual ownership and further weakening traditional clan structure; (3) the introduction of European political organization, allowing for the emergence of strong, individual leadership; (4) the establishment of legal and administrative districts in which European settlers dominated; and (5) population loss as a consequence of the introduction of European diseases.

1. **1832:** The Tribe was removed from the settlement established ten years earlier to a reservation comprising two townships east of Lake Winnebago in Wisconsin.[8] Factional conflict continued, however, regarding lands subsequently ceded by the Tribe to the United States.

2. **1839:** The Tribe ceded and relinquished one-half of the reservation established in 1832 in order to resolve intratribal factionalism[9] and in return for the promise of new lands.

3. **1843:** The United States granted citizenship to members of the Tribe and provided for the subdivision and allotment in severalty of remaining Indian lands.[10] The Tribe split into two factions: the Indian and Citizen parties.[11]

4. **1846:** The Act of 1843 was repealed, and congressional legislation required the enrollment of all Stockbridge-Munsee so that the reservation could be divided into Indian and Citizen districts.[12] The Citizen district would then be allotted in severalty.

5. **1848:** The Tribe ceded remaining lands in Wisconsin. Members of the Indian party were to remove to lands set aside in Minnesota; the Indian party refused to move.[13]

---

[8] The land obtained for the Tribe was ceded to the United States by the Menominee Tribe. *See* Treaty with the Menominee, 7 Stat. 405 (1832).

[9] *See* Treaty with the Stockbridge and Munsee, 7 Stat. 580 and 11 Stat. 577 (1839).

[10] *See* ch. 101, 5 Stat. 645 (1843).

[11] What was known as the "Old Citizen" party began after the passage of the Act of 1843. The "New Citizen" party comprised those who sought United States citizenship and allotments in fee simple under the Act of 1871.

[12] *See* ch. 85, 9 Stat. 55 (1846).

[13] *See* 9 Stat. 955 (1848).

In 1856, the federal government again attempted to resolve the dispute between the Citizen and Indian parties by negotiating a treaty which, *inter alia,* provided that: (a) the Tribe would relinquish and cede lands set aside for them in Wisconsin and Minnesota; (b) the Tribe would be removed from its settlement near Lake Winnebago to a reservation comprising two townships ceded by treaty with the Menominee;[14] (c) the new reservation would be surveyed, and a "fair and just allotment" of the lands would be made to tribal families and individuals;[15] (d) allotments issued to tribal members would be held in trust by the federal government, assignable after ten years or at the discretion of the President; (e) only actual members of the Tribe would be entitled to allotments; therefore, any members who emigrated west of the Mississippi under the terms of the Treaty of 1839 would have to return to the reservation within two years of its ratification to receive their share; and (f) if any of the allotments made to members under the Act of 1843 had been improperly sold or otherwise conveyed, the Secretary of the Interior was authorized to set aside the sales.

According to the Superintendent of Indian Affairs responsible for the negotiations, one-fifth of the tribal members did not sign the treaty due to disagreements over terms and the "factious spirit" which existed. *See* Letter of Francis Huebschmann, Superintendent of Indian Affairs, Feb. 23, 1856, Appendix to the Treaty of

---

[14] Within the boundaries of the reservation were the towns of Bartelme, Town 28 North, Range 13 East, and Red Springs, Town 28 North, Range 14 East.

[15] According to the terms of the treaty, the head of each family would receive 80 acres; single male adults would receive 80 acres; and single female adults and orphaned children would each receive 40 acres.

1856. Fifteen years later, in 1871, the federal government passed "An Act for the Relief of the Stockbridge and Munsee Tribe of Indians, in the State of Wisconsin."[16] The legislation provided for (a) the appraisal, survey, and sale of the two townships which had constituted the reservation since 1856; (b) a division of the proceeds between the Indian and Citizen parties; (c) citizenship for those who wished to apply; (d) the reservation of 18 sections of land for use by the Indian party; and (e) the allotment of those 18 sections among tribal members comprising the Indian party. *See* 16 Stat. 404–07.

Congress ultimately passed two more acts to resolve the intratribal conflict which had developed in 1843: The Act of March 3, 1893, 27 Stat. 744; and the Act of 1906, ch. 3504, 34 Stat. 382. The Act of 1893, in addition to providing patents for allotments received in 1856, also corrected errors in the 1871 legislation. The Act of 1906 mandated that those members of the Tribe who "have not heretofore received patents for land in their own right, shall, under the direction of the Secretary of the Interior, be given allotments of land and patents therefor in fee simple . . .." *See* 34 Stat. 382. The allotments were approved by the Secretary of the Interior in January 1910, and patents were delivered in April of that year. *See* 69 Op. Att'y Gen. 72, 77 (1980).

In 1934, the Tribe was reorganized under the provisions of the Indian Reorganization Act, 25 U.S.C. § 461, *et seq.* This Act, which ended the federal government's allotment policy, authorized the Secretary of the Interior to expand the land base of Indian tribes, 25 U.S.C. § 465, and to proclaim new reservations where none previously existed, 25 U.S.C. § 467. Pursuant to

---

[16] Act of February 6, 1871, 16 Stat. 404.

this Act, the federal government purchased 15,277 acres for the Tribe, all of which was located within the 1856 reservation.[17] *See* 48 Stat. 984; 49 Stat. 985; and 49 Stat. 986.

## II.

The Tribe contends that the boundaries of the 1856 reservation were never diminished by the Act of 1871. The state argues, however, that the reservation was diminished by the Act of 1871 and ultimately terminated by the Act of 1906. Accordingly, the state concludes that members of the Tribe do not have a right to fish, without a valid state license, outside the boundaries of the current reservation as established in 1934, even though it is located within territory set aside for the Tribe's use in 1856.

■
The issues raised herein present questions of law which this court reviews *de novo. See In Matter of Mental Condition of Virgil D.,* 189 Wis. 2d 1, 9, 524 N.W.2d 894 (1994).

Whether diminishment or termination of the Tribe's reservation occurred requires the following analysis: (a) did the language of the Act of 1871 expressly provide for diminishment; (b) did events surrounding the passage of the Act of 1871 reflect congressional intent to diminish the reservation; and (c) did legislation enacted after 1871 reflect congressional intent to terminate the reservation? *See Hagen,* 114 S. Ct. at 965 (citing *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 588 (1977)).

---

[17] Of the 15,277 acres purchased for the Tribe, 13,077 were considered to be submarginal lands. In 1972, Congress declared that these lands were to be held in trust for the Tribe. *See* 86 Stat. 795.

## THE LANGUAGE OF THE ACT OF 1871 DOES NOT EXPRESSLY REQUIRE DIMINISHMENT

During the second half of the 19th century, the pace of population growth and territorial expansion in the United States forever changed the relationship between the federal government and Indian tribes. In 1853, Congress adopted a policy of allotment whereby communal tribal ownership of lands was supplanted by the grant of individual parcels in fee simple.[18] Underlying this policy was the belief that Indians ought to be

---

[18] The allotment concept can be traced back to 1633. *Handbook of Federal Indian Law* 129. Typically, allotment occurred in one of two ways: (1) in "trust," whereby the parcel of land allotted was owned by the United States in trust for the individual Indian; or (2) in "restricted fee," meaning that the parcel of land was owned by the individual Indian, subject to a restriction on alienation in favor of the United States or its officials. *Id.* at 615–16.

During the period in which the allotment policy was in effect, Congress also passed the Act of 1871, ch. 120, § 1, 16 Stat. 566, now codified as 25 U.S.C. § 71, which provided in pertinent part that

> No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired.

The genesis of this Act was opposition by the House of Representatives to its exclusion from a policy role in Indian affairs. *See Antoine v. Washington,* 420 U.S. 194, 202 (1975). The House, refusing to grant funds to carry out new treaties, gained access to the policymaking role when the Act was added as a rider to the Indian Appropriation Act of 1871. *Id.* This Act, in combination with the allotment policy, had the effect of lessening tribal autonomy.

assimilated into the American way of life, thereby destroying the "savagery" of tribal autonomy. *Handbook of Federal Indian Law* 128–29. If Indians adopted the habits of "civilized life," according to the prevailing view, they would need less land, and the surplus would be available for white settlement. *Id.* at 128. This sentiment was expressed by the Commissioners of Indian Affairs in 1838 and again in 1876: "Common property and civilization cannot co-exist," Comm'r Ind. Aff. Ann. Rep., S. Doc. No. 9, 25th Cong., 3d Sess. 440, 454 (1838); and "[i]t is doubtful whether any high degree of civilization is possible without individual ownership of land," Comm'r Ind. Aff. Ann. Rep., H.R. Exec. Doc. No. 1, 44th Cong., 2d Sess. 381, 387 (1876).

The systematic effort by the federal government to persuade tribes to accept grants in trust or fee simple culminated with the passage of the General Allotment Act of 1887,[19] which provided for the mandatory allotment of reservation lands.[20] In accordance with this legislation, the federal government also sought the cession of tribal lands remaining after allotment. These surplus lands were opened to non-Indian purchase and homesteading. *Handbook of Federal Indian Law* 613.

By the 1920's, the allotment policy was considered a failure. *Id.* at 614. Instead of benefiting the Indians by encouraging assimilation, the policy often resulted in the loss of lands through misrepresentation and poverty for Indians who sold their allotments to pay

---

[19] Act of February 8, 1887, ch. 119, 24 Stat. 388.

[20] Prior to the passage of the General Allotment or Dawes Act in 1887, the federal government sought tribal consent before allotting lands. After the Civil War, allotment efforts increased, so that by 1887 consensual efforts were replaced by a mandatory program. *Handbook of Federal Indian Law* 613.

taxes.[21] Another consequence of the allotment policy was the conflict regarding the issue of whether a state or particular Indian tribe maintained jurisdiction over unallotted lands which, according to treaties, were included in original reservation boundaries. *Id.* at 348–49. For example, in *DeCoteau,* 420 U.S. at 426–27, the United States Supreme Court considered whether "the Lake Traverse Indian Reservation . . . created by an 1867 treaty . . . was terminated and returned to the public domain, by the Act of March 3, 1891, c. 543, 26 Stat. 1035." According to the Act of 1891, the tribe agreed to "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation . . .." 26 Stat. 1036. In addition to holding that the Act terminated the reservation, the Court articulated two principles which would govern subsequent judicial analysis on the question of diminishment: (a) congressional intent to diminish or terminate a reservation must be clear in order to overcome the general rule that doubtful expressions are to be resolved in favor of the Indians; and (b) congressional intent to diminish or terminate a reservation must be expressed on the face of the act or be clear from the legislation's surrounding circumstances and legislative history. [22] *DeCoteau,* 420 U.S. at 444.

---

[21] By 1934, 90 million acres of tribal lands had been lost through allotment. *Id.*

[22] *See Hagen v. Utah,* 114 S. Ct. 958 (1994) (the restoration of unallotted reservation lands to public domain evidences a congressional intent to diminish); *Oregon Fish & Wildlife Dept. v. Klamath Tribe,* 473 U.S. 753 (1985) (the tribe's exclusive right to hunt and fish on lands reserved by treaty did not survive as a special right free of state regulation on lands ceded under subsequent legislation); *Solem v. Bartlett,* 465 U.S. 463

Only Congress can divest a reservation of its land and diminish its boundaries.[23] *Solem,* 465 U.S. at 470. "Once a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise." *Id.* (citing *United States v. Celestine,* 215 U.S. 278, 285 (1909)). Thus, diminishment is not to be lightly inferred, and courts will look for references to cession or other language reflecting a tribe's total surrender of interests in reservation lands. *Id.*[24] For example, in *DeCoteau,* 420 U.S. at 439–40

(1984) (when both a surplus land act and its legislative history fail to provide substantial and compelling evidence of congressional intent to diminish reservation boundaries, the court is bound by traditional solicitude to the Indians to rule that diminishment did not occur); *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584 (1977) (the language and legislative history of congressional legislation demonstrated a congressional intent to diminish the boundaries of the reservation and remove certain lands from tribal jurisdiction); and *United States v. Grey Bear,* 828 F.2d 1286 (8th Cir. 1987) (the court must consider three primary factors to determine whether diminishment has occurred: the face of the relevant act, events surrounding its passage, including legislative history, and subsequent treatment of the land).

[23] In *Lone Wolf v. Hitchcock,* 187 U.S. 553 (1903), the United States Supreme Court affirmed Congress's plenary powers in the area of Indian law by deciding that Congress could diminish reservations unilaterally.

[24] Because the abrogation of a treaty is not to be lightly inferred, the courts have adopted a number of canons of construction, including: (1) treaties are to be liberally construed in favor of the Indians; (2) ambiguous expressions in treaties must be resolved in favor of the Indians; (3) treaties should be construed as the Indians would have understood them; and (4) the

n.22, the Court identified explicit cession language from a series of surplus land acts, including the following:

> 'cede, relinquish, and surrender, forever and absolutely, to the United States, all their claim, title and interest of every kind and character, in and to the following described tract of country . . ..' 26 Stat. 1019 (Absentee Shawnee Indians).

> 'cede, grant, relinquish, and quitclaim to the United States all right, title, and claim which they now have, or ever had, to all lands in said Territories and elsewhere, except the portion of land within the boundaries of their present reservation in the Territory of Idaho . . ..' 26 Stat. 1027 (Coeur d'Alene Indians(I)).

Though the Act of 1871 was subject to the same federal allotment policy as the surplus land acts of the 19th century, it had a decidedly different purpose: to provide the Tribe with relief from 40 years of continuing intratribal strife and factionalism. Congress did not incorporate into the Act explicit cession language which would have established probative evidence of diminishment. Instead, the provisions of the Act called for the appraisal and sale of reservation lands so that tribal assets could be disbursed among the members. Since the Act of 1871, on its face, did not expressly call

---

wording of treaties and statutes ratifying the agreements are not to be construed to the Indians' prejudice. *See Handbook of Federal Indian Law* 222; *Antoine v. Washington,* 420 U.S. 194, 199 (1975). We conclude that this case is distinguishable from classic treaty abrogation cases in which the federal government sought to acquire Indian lands for white settlement and national expansion; therefore, we find no violation of any of the aforementioned canons.

407

for diminishment, we must now examine the circumstances surrounding the passage of the Act. These circumstances, we believe, "unequivocally reveal a widely held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation . . .." *Solem,* 465 U.S. at 471.

## THE ACT OF 1871 WAS THE CULMINATION OF A PATTERN OF DIMINISHMENT BEGUN IN 1843

Beginning in 1843, congressional legislation provided that the township occupied by the Tribe "be partitioned and divided among the different individuals composing said tribe of Stockbridge Indians, and may be held by them, separately and severally, in fee simple . . .." 5 Stat. 645, § 1. Members of the Tribe were deemed to be citizens of the United States, subject to the jurisdiction of the federal government and the Territory of Wisconsin. This led to permanent factionalism and the emergence of the Indian and Citizen parties.

The congressional legislation was repealed in 1846, when the Indian party refused to recognize the validity of the legislation and petitioned the federal government for relief. The Act of 1846, 9 Stat. 55, "restored [the Tribe] to their ancient form of government, with all powers, rights, and privileges, held and exercised by them under their customs and usages, as fully and completely as though the . . . act had never passed." Section 2 of the Act, however, provided that: (a) those who still desired to become citizens had three months (from the date of passage) to personally file an

application;[25] (b) tribal lands were divided into an Indian district and a Citizen district; (c) the lands in the Citizen district were to be divided; and (d) each individual who became a citizen was to receive allotments in fee simple.

When tribal factionalism did not abate, the Treaty of 1848 was negotiated. This treaty required the renunciation of all privileges secured under the 1843 legislation. The Tribe, once again placed under the "protection and guardianship" (Article I) of the United States, "[sold] and relinquish[ed]". (Article III) the township it occupied. In return, the federal government made arrangements to relocate the Tribe west of the Mississippi. The treaty also authorized a survey of the ceded township, patenting to those who had become citizens the lands allotted to them by the Act of 1843.

Refusal by a majority of the Tribe to relocate necessitated the negotiation of the Treaty of 1856,[26] wherein the continuing state of intratribal strife was described as follows:

> Whereas a majority of the said tribe of Stockbridges and the Munsees are averse to removing to Minnesota and prefer a new location in Wisconsin, and are desirous soon to remove and to resume agricultural pursuits, and gradually to prepare for citizenship, and a number of other members of the

---

[25] According to historical records, no one in the Tribe actually enrolled for United States citizenship. *See* H.R. Rep. No. 558, 52d Cong., 1st Sess. 7 (1891–92).

[26] The Treaty of February 5, 1856, 11 Stat. 663, describes specific rights and obligations for the Tribe's members. The Treaty of February 11, 1856, 11 Stat. 679, describes the agreement between the federal government and the Menominee Tribe, which ceded the two townships on which the new reservation was located.

said tribe desire at the present time to sever their tribal relations and to receive patents for the lots of land at Stockbridge now occupied by them; . . .

[T]hese articles of agreement have been entered into . . ..

11 Stat. 663. As a result of this treaty, the Tribe (a) ceded the lands they occupied, as well as 72 sections reserved for them in Minnesota; (b) received, as a new reservation, two townships of land ceded by the Menominee Tribe; and (c) received allotments within the new reservation, held in trust by the federal government.[27] In light of the factious history of the Tribe, Article XI provided:

The object of this instrument being to advance the welfare and improvement of said Indians, it is agreed, if it prove insufficient, from causes which cannot now be foreseen, to effect these ends, that the President of the United States may, by and with the advice and consent of the Senate, adopt such policy in the management of their affairs, as in his judgment may be most beneficial to them; or Congress may, hereafter, make such provision by law, as experience shall prove to be necessary.

When a minority of the Tribe refused to sign the treaty, Congress once again interceded and passed the 1871 legislation.[28]

---

[27] According to the treaty, the allotments would be held in trust for ten years, after which time patents for the lands would be issued. *See* Article III.

[28] Some tribal members argued that the Act of 1871 was forced upon unsuspecting Indian party members as a result of a partnership between the Citizen party and white businessmen who wanted access to the rich timberlands on the reservation. S. Misc. Doc. vol. 5 at 32, 52d Cong., 1st Sess. (1891–92).

The pertinent language of the Act of 1871, provided below, clearly reflects the desire of the Tribe to sell reservation lands and divide the assets among members:

Sec. 1:  "[T]he two townships [shall be] examined and appraised . . . according to public survey . . .."

Sec. 2:  "[T]he said two townships of land shall be advertised for sale . . . and shall be offered at public auction . . ." and "the Secretary of the Interior is hereby authorized to reserve from sale a quantity of said lands not exceeding eighteen contiguous sections, embracing such as are now actually occupied and improved . . .."

Sec. 5:  "[A] part of said sum due the Indian party . . . may . . . be expended in securing a new location for said tribe, and in removing and aiding them to establish themselves in their new home; and in case of their procuring and removal to such new location, at any time, the said eighteen sections . . . shall be sold . . . and the proceeds thereof be placed to their credit as aforesaid."

Sec. 6:  "[T]wo rolls, . . . the citizen roll . . . and the Indian roll, [shall be prepared] . . .. After the said rolls shall be made . . ., the same shall be held as a full surrender and relinquishment on the part of the citizen party . . . [of all tribal claims], . . . and they . . . shall thenceforth be admitted to all the rights and privileges of citizens of the United States."

Sec. 7:  "[T]he said Indian party shall thenceforth be known as the 'Stockbridge tribe of Indians,' and may be located upon lands reserved by the second section of this act, or such other reservation as may be procured for them . . ."

Sec. 8:  "[A]s soon as practicable, after a suitable and permanent reservation shall be obtained . . .

411

either at their present home or elsewhere . . . a just and fair allotment [shall be made]."

■

The implementation of this Act meant that (a) the members of the Citizen party explicitly relinquished all of their rights in the land; and (b) the Indian party, though retaining the right to reserve 18 sections from the two townships, had the option to move to an entirely new location in the future. If the Act of 1871 did not diminish reservation status in the two townships, it stands to reason that members of the Indian party would have asked for and been entitled to greater consideration in terms of property rights.[29] Further, if members of the Indian party decided to exercise the option of moving to a new location, reservation status for the two townships would have been forsaken, since Congress, by means of the Act, intended to establish only one reservation for the remaining members of the Tribe. Congress could scarcely have contemplated the complete termination of reservation status on the 18 sections if the Tribe moved, while maintaining reservation status for the balance of the two townships. We conclude that the effect of the Act of 1871, therefore, was to diminish the size of the reservation, as created by treaty in 1856, to 18 sections.

■

Historical documents also reflect the intent to diminish. For example, in the 1871 Report of the Commissioner of Indian Affairs, it was noted that the reservation comprised 46,000 acres. *See* Comm'r Ind. Aff. Ann. Rep. at 513 (1871). A subsequent annual

---

[29] The Act provided that members of the Indian party would receive the same allotment, whether they remained on the 18 sections or moved to a new location.

report from the same federal office indicated that the reservation of this Tribe contained about 11,500 acres and adjoined the southern township of the Menominee reserve, the balance of the Tribe's lands having been disposed of by act of Congress February 6, 1871.[30] Comm'r Ind. Aff. Ann. Rep. (1874).

## LEGISLATION ENACTED AFTER 1871 SUPPORTS A FINDING OF DIMINISHMENT

Legislation enacted subsequent to 1871 provided for the allotment of remaining tribal lands. The Act of 1893, 27 Stat. 744, stated that all tribal members

> who entered into possession of lands under the allotments of [the Treaties of 1856 and 1871], and who by themselves or by their lawful heirs have resided on said lands continuously since, are hereby declared to be owners of such lands in fee simple, in severalty, and the government shall issue patents to them therefor.[31]

*See* 69 Op. Att'y Gen. at 76. On June 21, 1906, Congress passed additional legislation authorizing the allotment of all remaining lands within the reservation, in fee simple and without condition. 34 Stat. 382; *see also* 69 Op. Att'y Gen. at 76.[32] Patents for these allotments

---

[30] According to charts submitted along with the reports, the reservation, after 1871, was described as encompassing 18 square miles, representing the 18 remaining sections.

[31] Members of the "Old Citizen" party claimed they had been improperly excluded from the roll required by the Act of 1871. However, under the Act of 1893, they were considered members of the Tribe, and the Secretary of the Interior was directed to prepare a new enrollment. 69 Op. Att'y Gen. at 76.

[32] Those who were eligible could choose to take the cash value of the parcel instead of receiving the allotment. *Id.*

were delivered on April 4, 1910. *See United States v. Gardner,* 189 F. 690, 693 (E.D. Wis. 1911).

The Tribe sought final dissolution of its status and distribution of tribal property when it submitted a "Proposed Plan of Settlement with the Stockbridge and Munsee Tribe of Indians."[33] *See* S. Rep. No. 173, 58th Cong., 2d Sess. (1904). Under this proposal, the Tribe was to accept a "full and complete settlement of all obligations of the Government of whatever nature or kind, either expressed or implied, from whatever source the same may have accrued . . .." The proposal requested patents for any remaining reservation lands, in addition to the division of tribal funds held by the federal government. Though not formally adopted, the proposal was considered to be the basis for the 1906 legislation, since portions of the plan were incorporated verbatim into the Act. *See United States v. Anderson,* 225 F. 825, 829 n.1 (E.D. Wis. 1915).

We conclude that diminishment of the Tribe's 1856 reservation occurred with the passage of the Act of 1871 and the final allotment of reservation lands by 1910. Such a finding is supported by a pattern of diminishment beginning in 1843, when the Tribe became permanently divided over the issues of United States citizenship and the allotment of tribal lands.

The final allotment in 1910 of the 1856 reservation lands, and the establishment of a new reservation under the Indian Reorganization Act of 1934, redefined the hunting and fishing rights of the Tribe, thereby limiting the exercise of those rights to the boundaries of the present reservation. The tribal right to hunt and

[33] The plan was signed at the reservation on December 8, 1900.

414

fish is considered a *profit a prendre* and an interest in real property. *See* 69 Op. Att'y Gen. at 81 (citing *Van Camp v. Menominee Enterprises, Inc.,* 68 Wis. 2d 332, 343, 228 N.W.2d 664 (1975)). Once that interest was sold, the right to hunt and fish on the lands in question was terminated. *See Oregon Fish & Wildlife Dept. v. Klamath Tribe,* 473 U.S. 753, 766 (1985). In this case, the tribal right to fish on the waters of Upper Gresham Pond did not survive the diminishment of the 1856 reservation by the Act of 1871. Following the final allotment of reservation lands in 1910, there was virtually nothing left of the original reservation. Accordingly, Bert Davids was fishing in a pond that was no longer a part of the Tribe's reservation but, rather, was within the jurisdiction of the state. Davids was, therefore, required to obtain a valid state fishing license to fish on those waters.

*By the Court.*—The decision of the court of appeals is reversed.

SHIRLEY S. ABRAHAMSON, J. *(dissenting).* The test for determining a tribe's reservation boundaries, according to the majority opinion and the United States Supreme Court, is whether Congress expressed its intent to diminish or terminate a reservation. Only Congress can divest a reservations of its land and diminish its boundaries.

The Congressional expression of intent to diminish or terminate a reservation must be clear from the face of the act and the circumstances surrounding the passage of the act, including the legislative history. *Hagen v. Utah,* 127 L. Ed. 2d 252, 265 (1994); *Solem v. Bartlett,* 465 U.S. 463, 470–71 (1984). While in other cases the court searches for clues about legislative intent, in

diminishment cases the evidence of legislative intent must be clear. Clarity is required, according to the Supreme Court, to overcome the general rule that doubtful legislative expressions are to be resolved in favor of the Indians. *See* majority op. at 396.

"The most probative evidence of diminishment is, of course, the statutory language used to open the Indian lands." *Hagen,* 114 S. Ct. at 965–66 (quoting *Solem,* 465 U.S. at 470 (1984)). The Act of 1871 provides for the sale of reservation land, but "the mere fact that a reservation has been opened to settlement does not necessarily mean that the opened area has lost its reservation status." *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 586–87 (1977). *See also DeCoteau v. District County Court,* 420 U.S. 425, 447 (1975); *Seymour v. Superintendent,* 368 U.S. 351, 356 (1962). The title to the individual plots in the area is irrelevant; "the entire block retains its reservation status until Congress explicitly indicates otherwise." Majority op. at 407 (quoting *Solem,* 465 U.S. at 470).

The parties appear to agree that Congress has not clearly expressed on the face of any act cited that it intended to diminish or terminate the reservation in issue. The thrust of the Act of 1871 was not to dissolve the tribe or its reservation but to emancipate a group of members who no longer wanted tribe membership and who wanted their fair share of the assets before leaving the tribe. The majority therefore must derive the "clear expression" of Congressional intent from the circumstances surrounding the passage of the act.

Although the majority opinion accurately recites the principles of interpreting congressional material for intent of diminishment, it fails to apply them. Instead the majority opinion imputes to Congress an intent to diminish the reservation when no clear evi-

dence of congressional intent exists. The court of appeals' opposing conclusion of congressional intent, inferred from the materials it examines, lends support to the conclusion that the legislative intent is not clearly expressed.

Perhaps the majority's conclusion of congressional intent can be inferred from the circumstances of the enactment of the 1871 legislation the majority examines. However, while the evidence garnered by the majority may tend to support diminishment, it is "hardly dispositive," *Solem,* 465 U.S. at 475; nor is it "substantial and compelling" as the cases require. *Solem,* 465 U.S. at 472.

I conclude that, at best, the legislation and the circumstances surrounding the enactment of the legislation are ambiguous regarding congressional intent. I therefore conclude that the state has failed to provide substantial and compelling evidence of a congressional intent to diminish. *Solem,* 465 U.S. at 472.

For the reasons set forth, I dissent.