# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-3834

STATE OF WISCONSIN,

*Plaintiff-Appellee,*

*v.*

THE STOCKBRIDGE-MUNSEE COMMUNITY and
ROBERT CHICKS,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 98 C 871—**Patricia J. Gorence**, *Magistrate Judge*.

ARGUED SEPTEMBER 3, 2008—DECIDED JANUARY 20, 2009

Before POSNER, RIPPLE, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge*. The Stockbridge-Munsee Indians
(the Tribe) are comprised of descendants of the Mohican
Tribe who migrated westward and eventually arrived in
Wisconsin in the 1820s. In 1856, the United States entered
into a treaty and created a reservation for the Tribe con-
sisting of two townships (Bartelme and Red Springs) in

Shawano County, Wisconsin, some 40 miles northwest of Green Bay. The issue in this case is straightforward—are the boundaries of that reservation still intact? The answer is important because the Tribe can only operate slot machines (under a contract with the State of Wisconsin entered into pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*) at the Pine Hills Golf and Supper Club,[1] an entity it purchased in the 1990s, if the course is within the exterior boundaries of the tribal reservation.[2] Everyone agrees that Pine Hills, which is in Section 2 of the township of Red Springs, falls within the original boundaries of the reservation, but Wisconsin filed this suit because it believes that Pine Hills lies outside the reservation as it stands today. The magistrate judge (Patricia J. Gorence) agreed, granting summary judgment for the State after holding that the reservation, as it existed over 150 years ago, was extinguished by two legislative acts, which first allowed non-Indians to pur-chase a large section of the 1856 reservation, and then

---

[1] The Tribe's Pine Hills golf course, which carries a Wisconsin State Golf Association (WSGA) rating of 70.2 and a slope of 126, is located on Pine Hills Drive in or near the Village of Gresham. *See www.mohican.com*. It opened for play in 1999. It should not be confused with another Wisconsin course that operates under the same name. That Pine Hills, with a WSGA rating of 72.3 and a slope of 132, is a premier course in Sheboygan that recently hosted qualifying rounds for both the United States Open and the United States Senior Open championships.

[2] The Tribe validly operates the North Star Casino and Bingo on its present reservation.

allotted parcels of the reservation to tribal members. The reservation came back a bit, starting in 1937, but never reclaimed its full original size. The Tribe appeals.

The Tribe's history, like that of many other Indian tribes, was shaped by the constant pressure to move westward to make way for white settlers. Originally from western Massachusetts, the Tribe moved to the Hudson River Valley in New York after the Revolutionary War and eventually to a reservation east of Lake Winnebago in Calumet County, Wisconsin. But it was not long before the Tribe faced pressure to move out of its Lake Winnebago site. This pressure produced two factions within the Tribe. One faction, the Old Citizen Party, wanted to break free from its guardianship relationship with the United States. It sought full United States citizenship and the allotment of parcels of land to individual tribal members. Another group, the Indian Party, wanted to maintain a tribal structure and move to a new reservation west of the Mississippi. Between 1843 and 1848, a treaty and two legislative acts were passed and then repealed, seesawing between these positions. *See* Act of Mar. 3, 1843, ch. 101, 5 Stat. 645; Act of Aug. 6, 1846, ch. 85, 9 Stat. 55; Treaty with the Stockbridge Tribe of Indians, Nov. 24, 1848, 9 Stat. 955.

Unsurprisingly, this haphazard approach didn't help matters much. In 1856, a new compromise was brokered, and the Tribe entered into a treaty with the United States, agreeing to "cede and relinquish" its Lake Winnebago reservation (and other lands reserved for their use) in exchange for a new reservation in Wisconsin. Treaty with

the Stockbridge and Munsees, Feb. 5, 1856, 11 Stat. 679. "As soon as practicable," the new reservation was to be surveyed and allotted to the individual tribal members, and the Tribe's membership was defined by reference to an earlier treaty, which predated the series of seesawing legislative acts. *Id.* Although tribal members would have the right to occupy their allotments, they could not sell the land without first waiting 10 years and getting permission from both the Tribe and the United States government. But the controversy did not end here. The new reservation turned out to be heavily forested and difficult to farm—not quite the arable land that had been promised in the treaty. And to make matters worse, the Department of the Interior prevented the Tribe from cutting and selling the timber on the reservation. As the Tribe struggled to survive at its new spot, conflicts between the two factions renewed and stymied the allotment process.

Fifteen years later, Congress intervened again. In 1871, an act was passed, calling for the public auction, run by the government, of three quarters of the reservation. Act of Feb. 6, 1871, ch. 38, 16 Stat. 404.[3] Whatever land was not sold after two years was to be purchased by the gov-

---

[3] We have included, as an appendix to our opinion, six maps from the record that we think accurately track the changes to the reservation over the years. On five of six maps (all except the first one), the present location of Pine Hills is noted. In considering these maps, which we found helpful, it is worth remembering that a township consists of 36 sections, each covering one square mile.

ernment at below-market prices, and the proceeds from all the sales were to be divided amongst the tribal members. Those willing to sever their ties with the Tribe could take their share on a per capita basis, but the funds belonging to those who wished to remain in the Tribe were held in their trust by the United States. The last quarter of the reservation was "reserved" from sale, and the Tribe was given a choice to make their permanent home there or on an equivalent tract of land to be procured later. *Id*. at 405. The Tribe elected to stay put, and the remaining tribal members were eligible to receive allotments from this land, with restrictions on alienability. Most of the land up for sale went into the hands of timber companies that harvested the lumber.

But there was a catch. Those who had separated from the Tribe or had received allotments under previous acts— including the repealed acts regarding the old Lake Winnebago reservation—were expelled from the Tribe and received nothing. This provision ended up disfranchising members of the Old Citizen Party, who vociferously contested the 1871 Act's legitimacy. After receiving reports that the ouster of the Old Citizen Party was obtained by fraud, Congress stepped in again, and in 1893 it restored the tribal membership of those who were expelled. Act of Mar. 3, 1893, ch. 219, 27 Stat. 744. That act, however, did not restore the tribal membership of those who chose, under the 1871 Act, to receive their share of the proceeds of the sale up front and separate from the Tribe. This group became known as the New Citizen Party, and it separated from the Tribe without complaint.

This solution created its own set of problems—the tribal rolls swelled with the reenfranchisement of the Old Citizen Party, and although some tribal members cashed out of the Tribe, most did not. Soon, it was clear that there wasn't enough land to go around, and the allotment process again came to a standstill. The Tribe, unable to reap much benefit from the inhospitable land, pushed the Department of the Interior and Congress to step in again. The Tribe proposed a plan, approved by the Department, in which tribal members agreed to accept either allotments from the unsold portion of the reservation, allotments from additional land purchased by the United States, or cash in lieu of land, "as a full and complete settlement of all obligations . . . due to said tribe . . . from whatever source the same may have accrued, whether under the [1856 treaty], any act of Congress, or otherwise . . . ." These allotments, unlike the ones in previous acts, were alienable. This plan was proposed in 1900, but its passage stalled largely because Congress did not want the United States to foot the bill. Finally, in 1906, the proposal was tucked inside a larger appropriations act, but in its final form the Tribe, not the United States, was obligated to fund it. Act of June 21, 1906, ch. 3504, 34 Stat. 325, 382-83. Four years later, all the unsold land within the boundaries of the 1856 reservation was allotted to tribal members.

Following the allotments, the Tribe's reservation was, for the most part, treated as if it had faded out of existence. In the 1930s, the Department of the Interior worked with the Tribe to reacquire parts of the land described in the 1856 treaty, rededicating the property as the Tribe's

reservation. 2 Fed. Reg. 629 (Apr. 1, 1937); 13 Fed. Reg. 7718 (Dec. 13, 1948); Act of Oct. 9, 1972, Pub. L. No. 92-480, 86 Stat. 795. Later, Wisconsin and the Tribe entered into an agreement pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2710(d)(1)(C), which allowed the Tribe to operate gaming activities within the boundaries of its reservation. The Tribe purchased Pine Hills in 1993 and soon after set up slot machines there. Pine Hills falls within the boundaries of the 1856 reservation, but it was not part of the land reserved from the 1871 sale to the timber companies, nor has it been restored to reservation status by later legislation.

Wisconsin sued to enjoin the gambling and sought a declaration of the current boundaries of the reservation. The Tribe filed a counterclaim, asking the court to recognize the 1856 boundaries of the reservation and enjoin the State from imposing a tax on the income of tribal members who lived and earned their money within those boundaries. After the district court granted the State's motion for a preliminary injunction (which pulled the plug on the slot machines—golfers, of course, could still play away), both parties agreed that the Tribe would collect the contested taxes and hold them in escrow pending final resolution of this case. Both parties then filed motions for summary judgment. The State argued that the 1856 reservation was diminished by the 1871 Act's sale of reservation land to timber companies, and then extinguished by the 1906 Act, which allotted what remained of the reservation to individual tribal members. The Tribe, on the other hand, maintained that the reservation remained completely intact because Congress never

clearly demonstrated its intent to shrink or extinguish it in either 1871 or 1906, a position reiterated by the United States in an *amicus curiae* brief filed in the district court. Judge Gorence granted the State's motion, concluding that, while neither the 1871 Act nor the 1906 Act contained explicit language diminishing or disestablishing the reservation, the contemporaneous congressional records and subsequent treatment of the reservation demonstrated its intent to do so. The Tribe appeals, but the United States has not sought permission to appear here as an *amicus curiae* on the Tribe's behalf.[4]

We start with the unremarkable observation that once a reservation is established, it remains intact until Congress explicitly diminishes its boundaries or disestablishes it entirely. *Solem v. Bartlett*, 465 U.S. 463, 470 (1984); *United States v. Celestine*, 215 U.S. 278, 285 (1909). Because courts must construe Indian treaties sympathetically to Indian interests, an intent to alter a reservation's boundaries "will not be lightly inferred." *Solem*, 465 U.S. at 470. The most probative evidence of intent is the operative language of the act that purportedly shrinks a reservation. *Id.* But Congress was not always clear about its intentions for the boundaries of a reservation, primarily because at the turn of the last century, when many allotment acts

---

[4] The record does not tell us why the United States elected to sit this one out, but counsel for the Tribe told us at oral argument that he believed it did not file here because time was too short to do so. Another possibility, perhaps, is that the United States saw wisdom in Judge Gorence's analysis of the case.

were passed, it was operating under a different set of assumptions than it does now. Today, a reservation can encompass land that is not owned by Indians, 18 U.S.C. § 1151(a), but back then, the "notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar . . . ." *Solem*, 465 U.S. at 468. What's more, Congress believed that all reservations would soon fade away—the idea behind the allotment acts was that ownership of property would prepare Indians for citizenship in the United States, which, down the road, would make reservations obsolete. *Id.* Given these background assumptions, Congress would have felt little need to explicitly address a reservation's boundaries. We cannot, of course, extrapolate a clear intent to diminish a reservation from these generic assumptions. *Id.* at 468-69. But given this backdrop, we also cannot expect Congress to have employed a set of magic words to signal its intention to shrink a reservation. Absent such clear language, courts look to events surrounding the passage of the act that "unequivocally reveal a widely held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation," *id.* at 471, and, "to a lesser extent," events that occur after the passage of the act, *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 344 (1998).

With this framework in mind, we turn to the 1871 Act which, like many similar acts passed during this period, allotted a limited property interest to tribal members and opened the remaining land for sale to non-Indians. We must decide whether this act simply gave non-Indians a chance to buy land within an existing reservation or if the act was meant to diminish the reservation.

The 1871 Act includes no hallmark diminishment language, such as statements that the opened land is "restored to the public domain," *Hagen v. Utah*, 510 U.S. 399, 412-14 (1994), or that a tribe agrees to "cede, sell, relinquish, and convey" reservation land, *DeCoteau v. District County Court*, 420 U.S. 425, 436, 445 (1975). But the act does include other language which shows that Congress wanted to slice the opened lands off from the reservation. The act effectively created a new reservation for the Tribe from which tribal members could select their allotments. That reservation could consist of either the land "reserved" from the sale to the timber companies, "or such other reservation as may be procured for them." 16 Stat. 406. And the act goes on to require the expeditious allotment of land "after a suitable and permanent reservation shall be obtained and accepted by said tribe, either at their present home or elsewhere . . . ." *Id*. The clear implication is that the boundaries of the new reservation were not defined by the 1856 treaty, but rather by the Tribe and its acceptance of a new home. The Tribe ended up choosing the unsold portion of the 1856 reservation, which, by the terms of the 1871 Act, became its new, smaller, "permanent reservation."

These references to a new reservation may not, by themselves, be enough to demonstrate Congress's intent to diminish the reservation, *Solem*, 465 U.S. at 475 (reference to the "reservations thus diminished" and "the public domain" are insufficient to infer intent to diminish a reservation); *Mattz v. Arnett*, 412 U.S. 481, 498 (1973) (reference to a reservation in past tense insufficient to infer intent to diminish it), but we need not rest on them

alone. The circumstances surrounding the passage of this legislation show that it was more than a run-of-the-mill allotment act. The Tribe had a history of internal conflict which this legislation was meant to address by shrinking the Tribe itself. While Congress later repudiated the disenfranchisement of the Old Citizen Party, it never backed away from the provision that allowed tribal members to receive their share of the proceeds from the sale of the land up front in exchange for severance from the Tribe. Given this context, we cannot dismiss the references to a new permanent reservation as casual. To the contrary, it makes perfect sense—smaller tribe, smaller reservation. The Wisconsin Supreme Court, confronting the same issue we face here, similarly reasoned that if the "Act of 1871 did not diminish reservation status . . . it stands to reason that members of the Indian party would have asked for and been entitled to greater consideration in terms of property rights." *Wisconsin v. Davids*, 534 N.W.2d 70, 80 (Wis. 1995). Finding that reading untenable, the court held that the 1871 Act diminished the Tribe's reservation. *Id*. at 72. We agree.

What's more, the reservation was consistently treated as if it had been diminished by the 1871 Act. The Commissioner of Indian Affairs, in multiple reports following the act, excluded the land sold to the timber interests from its descriptions of the reservation. Maps from the General Land Office did likewise. The Tribe itself—when advocating before the Senate for the passage of the 1893 Act which reenfranchised the Old Citizen Party—admitted that their reservation had been diminished. The Tribe attempts to introduce ambiguity into this otherwise

consistent picture by pointing to the preamble of the 1893 Act, which states that the Tribe received a reservation under the 1856 treaty, "upon which they have ever since resided." 27 Stat. 744. The Tribe, despite taking a contrary position when advocating for the legislation, now reads this statement to be a reaffirmation of the 1856 reservation and its boundaries. But this reference, in an act about the Tribe's membership, not its land, cannot be understood as a resurrection of the original reservation boundaries. The reference merely points out that the Tribe continued to live on land reserved for them by the 1856 treaty, a fact that was both true and consistent with diminishment. They resided within the 1856 reservation, just on a smaller part than they originally did. In any event, this statement, made 20 years after the fact, sheds little light on what Congress intended to do when passing the act in 1871. *Yankton*, 522 U.S. at 344, 356; *Mattz*, 412 U.S. at 505.

The 1906 Act, like the 1871 Act, included none of the hallmark language suggesting that Congress intended to disestablish the reservation. The relevant provision was just a few paragraphs tucked inside a larger appropriations act, and it explains only how the tribal members will be given allotments of land. The act addressed the "small shoe, big foot" problem—the remaining reservation was too small to provide parcels to all tribal members. The Supreme Court has repeatedly held that allotting land to Indians is consistent with continued reservation status, *see, e.g.*, *Solem*, 465 U.S. 473-74; *Mattz*, 412 U.S. at 497; *Seymour v. Superintendent*, 368 U.S. 351, 357-58 (1962), therefore, this language alone is insufficient to abolish the reservation.

However, the circumstances surrounding the act show that Congress wanted to extinguish what remained of the reservation when it passed the act. By the 1900s, the Tribe was anxious to complete the stalled allotment process, and it worked with the Department of the Interior to propose a plan to get the land divvied up. The plan they came up with required the purchase of additional land to complete the allotments and gave tribal members an option to receive cash in lieu of land—all at the expense of the United States. This proposed plan (and the proposed bill that tracked it) was unequivocal—the completion of the allotment process was to be "a full and complete settlement of all obligations" the United States had under the 1856 treaty, including the reservation it created. The Department of the Interior urged Congress to pass the bill to facilitate "a final adjustment" of the Tribe's affairs, and a report from the House Committee on Indian Affairs noted that the bill was "drawn so as to carry out the plan of settlement" formulated by the Tribe. It's clear from this congressional record that all the parties at the table—the Tribe, the Department of Interior, and Congress—expected that the completion of the allotment process would end the 1856 treaty and the reservation it created. Of course, the Tribe did not get the bargain it sought—the Tribe, not the United States, was required to fund the proposed compromise. But Congress can act unilaterally, even when abrogating its treaty obligations with an Indian Tribe, *Lone Wolf v. Hitchcock*, 187 U.S. 553, 566, 567-68 (1903), and although this change shifted, perhaps unfairly, the burden of payment, it is not our place to rewrite history.

The intent to extinguish what remained of the reservation is born out by the act's provision for allotments in fee simple. This provision sets the 1906 Act apart from most allotment acts, like the 1871 Act, which restricted the Indian owners from selling their land or required that it be held in trust by the United States. 3 *Cohen's Handbook of Federal Indian Law* § 3.04.3; *see, e.g.*, Dawes Act, ch. 119, 24 Stat. 388, 389 (1887). Why include this peculiar provision? Because the reservation could only be abolished if the tribal members held their allotments in fee simple. *See Mattz*, 412 U.S. at 496 ("When all the lands had been allotted and the trust expired, the reservation could be abolished."). By 1910, all the land in the 1856 reservation was sold to non-Indians or allotted in fee simple, which meant that Congress paved the way for non-Indians to own every parcel within the original reservation and ensured that the reservation could be immediately extinguished.

In the aftermath of the act, the reservation was treated, for the most part, as though it had been abolished. *See, e.g., United States v. Anderson*, 225 F. 825 (E.D. Wis. 1915) (noting in title dispute case that the reservation had been dissolved); *United States v. Gardner*, 189 F. 690, 693, 696 (E.D. Wis. 1911) (suggesting that the reservation expired once the land was allotted). The land became subject to state taxes, and the Department of the Interior refused to intervene in alcohol-related problems within the original reservation. And once official policy towards Indians shifted away from allotments and assimilation, the Department of the Interior worked with the Tribe to reacquire large parts of its 1856 reservation, declaring

the newly reacquired land to be the Tribe's reservation. There were exceptions to this understanding, but aberrational statements are not enough to overcome the clear record showing Congress's intent to extinguish the reservation and the otherwise consistent treatment of the reservation as disestablished.

We, like Judge Gorence, do not lightly reach the conclusion that the Tribe's reservation was diminished by the 1871 Act and subsequently extinguished by the 1906 Act. The present, reestablished reservation is but a part of the original two-township reservation created in 1856. And the Pine Hills entity is not within the boundary of the reservation as it exists today. On this point Congress's intent is clear. Accordingly, we AFFIRM the judgment of the district court.

RIPPLE, *Circuit Judge*, concurring. I join the judgment and the opinion of the court. I write separately simply to underline that today's decision does not constitute a departure from the general rule that once Congress has established a reservation, its boundaries remained fixed unless Congress explicitly diminishes those boundaries or disestablishes the reservation. As the court's opinion makes explicit, this general proposition is firmly embedded

in our jurisprudence. *See Solem v. Bartlett*, 465 U.S. 463, 470 (1984). Moreover, explicit legislative language remains "[t]he most probative evidence of congressional intent." *Id.*

Today's opinion not only states these propositions unequivocally, but also demonstrates cogently that the unique historical context makes it unreasonable for us to demand a clearer statement in the statutory language. On this basis, I am pleased to join the judgment and the opinion of the court.



STOCKBRIDGE - MUNSEE RESERVATION

1856-1871

BARTELME
(T. 28 N. - R.13 E.)

RED SPRINGS
(T. 28 N. - R.14 E.)

Reservation established by 1856 treaty



STOCKBRIDGE - MUNSEE RESERVATION

1871-1910

BARTELME
(T. 28 N. - R.13 E.)

RED SPRINGS
(T. 28 N. - R.14 E.)

Pine Hills

18 contiguous sections selected by Tribe as new reservation pursuant to Act of 1871



**STOCKBRIDGE - MUNSEE RESERVATION (NONE)**

1910-1937

BARTELME
(T. 28 N. - R.13 E.)

RED SPRINGS
(T. 28 N. - R.14 E.)



STOCKBRIDGE - MUNSEE RESERVATION

1937-1948

BARTELME
(T. 28 N. - R.13 E.)

RED SPRINGS
(T. 28 N. - R.14 E.)

Pine Hills

New reservation created by proclamation dated March 19, 1937



STOCKBRIDGE - MUNSEE RESERVATION

1948-1972

BARTELME
(T. 28 N. - R.13 E.)

RED SPRINGS
(T. 28 N. - R.14 E.)

Lands added to reservation by proclamation dated December 7, 1948

New reservation created by proclamation dated March 19, 1937



STOCKBRIDGE - MUNSEE RESERVATION

1972-Present